## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
## WESTERN DIVISION

UNITED STATES OF AMERICA

v.                                    No. 4:04CR00274-01 JLH

ALVIN CLAY

## OPINION AND ORDER

Alvin Clay, an attorney, was indicted by a grand jury for one count of conspiracy to commit wire fraud, five counts of wire fraud, and six counts of money laundering.  Clay filed a motion to dismiss the indictment, a motion to suppress the evidence seized during a search of his offices, a motion to sever his trial from the trial of the other defendants, Donny McCuien and Raymond Nealy, a motion for discovery and inspection, a motion in limine, and a motion for a bill of particulars.  For the following reasons, Clay's motions are denied.

### I.

This case involves a mortgage-fraud scheme that Clay and his codefendants are alleged to have perpetrated by inducing mortgage lenders to pay for construction work that was never actually done.  In his motion to dismiss, Clay argues that the indictment is insufficient and that he is being prosecuted in retaliation for his representation of Mary Edelmann in a contentious criminal case.  Clay points to the fact that Assistant United States Attorney George Vena initiated the investigation of Clay at the same time that he faced Clay in the *Edelmann* case.  In his motion to suppress, Clay challenges the veracity of the statements contained in the affidavit FBI Agent Rodney Hays prepared for the search of Clay and Nealy's offices, as well as the credibility of Kenny Wright, the informant who was the primary source of information for the warrant affidavit.

The Court held an evidentiary hearing on the motion to dismiss for vindictive prosecution and the motion to suppress.   Kenny Wright, Darrell Brown, Mark Leverett, Robert Govar, George Vena, and Rodney Hays testified at the hearing.   Based on all of the evidence, the Court makes the following findings of fact.

A.      *Edelmann* Case

In October of 2002, Vena entered an appearance for the Government in *United States v. Mary K. Edelmann*, No. 4:02CR00128 (E.D. Ark.).   Clay represented Edelmann.   The *Edelmann* case was quite contentious, as Edelmann made serious allegations of misconduct by the personnel of the United States Attorney's Office in Little Rock.   According to Vena, Edelmann is an "unmitigated liar."

In February of 2003, Vena noticed that Edelmann had signed two motions for Clay.   Shortly after those motions were filed, they were replaced by identical motions signed by Clay.   Vena also noticed a difference in the writing style of the briefs filed on behalf of Edelmann.   One of the briefs referred to Edelmann's house as "my house."   Vena thought that Clay was allowing Edelmann to draft motions and briefs and that Clay was not reviewing them before they were filed.   He thought that Clay might be getting too close to his client, who was untrustworthy, and that a judge might not find it proper that Edelmann was signing motions for Clay.

In March of 2003, Darrell Brown entered an appearance as co-counsel for Edelmann.   Vena had known Brown for more than twenty years and had a friendly relationship with him.   Vena expressed his concerns to Brown about Clay getting too close to his client.   Vena told Brown that "Clay needed to be careful in his representation of Ms. Edelmann."

On February 11, 2004, Assistant United States Attorney Anne Gardner was substituted as counsel in *Edelmann* for Vena.   On February 25, the Government filed a Rule 44 motion to disqualify Clay as counsel for Edelmann because of the Government's pending investigation of Clay. The Honorable George Howard, Jr., granted the motion.

The *Edelmann* case proceeded to trial.   Vena entered his appearance again on March 24, 2004, and assisted Gardner at Edelmann's trial in June of 2004.

## B.    Meetings with Wright

While the *Edelmann* case was proceeding, an investigation of Clay, Nealy, and McCuien began when Kenny Wright, a former business associate of Nealy, came forward and met with Vena, FBI Agent Rodney Hays, and another agent. Wright knew Nealy and through Nealy had come to do some work for Clay, specifically an entity Clay owned called Clay Construction Company.

Sometime around June of 2003, Wright became concerned that some of the work he was doing for Clay and Nealy was not legitimate after McCuien, an associate of Nealy and Clay, told Wright that Clay Construction did not actually do any construction work.   Wright concluded, among other things, that the 1099s that he had prepared for Clay Construction were false.   Because he feared that what he had done for Clay and Nealy was going to expose him to criminal liability, Wright went to Mark Leverett, a local attorney, for help.

At the time Wright came to him, Leverett was working with Vena to conclude the pretrial diversion of Clyde Kelly.   Leverett told Vena during one of their telephone conversations concerning

Kelly that an individual had some information on Nealy and wanted to come in and talk with the Government.[1]

As a result of that conversation, Vena contacted the FBI to find out if any agent had a pending investigation involving Nealy.  Hays took Vena's call because he had recently interviewed Nealy concerning an unrelated manner.  Hays agreed to come with Vena to meet with Wright, and Vena set up a meeting with Leverett and Wright at his office.

On July 1, 2003, Wright met with Vena and Hays under a limited grant of immunity.  Wright implicated Nealy, McCuien, Clay, and himself in a mortgage-fraud scheme.  According to Wright, persons were solicited to purchase homes; appraisers associated with Nealy claimed that the homes needed to be repaired; fraudulent construction invoices were then prepared in the name of Clay Construction claiming that the work was performed; and, at closing, checks were issued to Clay Construction even though no construction work had been performed.

Wright met with agents again on July 8 and August 1 to review documents that Wright provided.  Wright provided lists of information that Nealy gave him to use for preparing false tax returns, a false W-2, and two pay stubs.  Some of these documents had on them the fax number of Ideal Mortgage, Nealy's business.  Wright also provided Clay's social security number.  Some time between the July 8 meeting and the August 1 meeting, when he understood the depth of the allegations against Clay, Leverett withdrew from representing Wright in order to avoid a conflict of interest.  Leverett testified that he attended law school with Clay and formerly lived next door to him.

---

[1] Leverett's memory of the sequence of events differed from that of Wright and Vena. Vena, however, refreshed his memory by reviewing documents pertaining to Clyde Kelly.  He brought those documents with him to court and referred to them during his testimony.  Leverett testified earlier than Vena and did not have the benefit of having his memory refreshed by reference to Clyde Kelly.

4

**C.      The Investigation**

On July 3, 2003, Vena and Robert Govar, the criminal division chief of the United States

Attorney's Office, opened a case against Clay based on Wright's information.

In August 2003, Vena requested the income tax return records for Clay and Nealy in 2000,

2001, and 2002 from the Internal Revenue Service.  The IRS replied in September that Clay had not

filed a return in 2001.  The IRS also stated that they had not yet found Clay's 2002 records.

Hays took steps to verify the information provided by Wright.  Hays checked the Arkansas

Secretary of State's website and found that the corporate licenses of both Clay Construction and Clay

Real Estate, another of Clay's businesses, had been revoked for failure to pay the franchise tax.  Hays

did not contact the Contractors Licensing Board to inquire about Clay Construction's contractor's

license because he believed that the records he would want might have required a grand jury

subpoena and seeking them from the Board might have alerted other parties to the investigation.

Hays arranged for Wright to take an undercover FBI agent to Nealy's office in September

2003.  The agent spoke with Nealy on several occasions and recorded their conversations.  In

October 2003, Hays went to Clay and Nealy's offices located in Suite 1050 of the Tower Building

with another agent.  They noticed that the Alvin D. Clay Law Office, Ideal Mortgage, and Clay Real

Estate were listed on the Tower Building's directory as located in Suite 1050.

Hays prepared an affidavit in support of a search warrant for Suite 1050 of the Tower

Building and sent a first draft to Vena in October 2003, but Vena did not respond.  Hays again

contacted Vena a month later about reviewing his affidavit, but Vena told Hays that he did not have

time to look at it.

Hays let another month pass before he spoke to Govar in December of 2003 about Vena reviewing his affidavit. Govar told Hays that Vena was too busy to review the affidavit because he had begun working on the Axciom investigation in August and that investigation was monopolizing his time. According to Hays, at that point Govar took Vena off the case and transferred it to Assistant United States Attorney Karen Coleman.[2] Govar reviewed the warrant affidavit himself for legal sufficiency because it proposed to search an attorney's office.

On January 11, 2004, Hays applied for a search warrant to search the Alvin D. Clay Law Office, Clay Real Estate, and Ideal Mortgage, all located at Suite 1050 of the Tower Building. He included in his affidavit information supplied by Wright and information he had gathered himself. The magistrate issued a warrant, and, pursuant to that warrant, the FBI searched Suite 1050 of the Tower Building on January 16, 2004.

At some point, Clay testified before the grand jury and asserted his Fifth Amendment privilege. Coleman asked Govar to help her determine whether the Fifth Amendment privilege applied in this case.

On December 8, 2004—more than seventeen months after the initiation of the investigation—a grand jury returned an eighteen-page indictment charging Clay, Nealy, and McCuien with one count of conspiracy to commit wire fraud, five counts of wire fraud, and six counts of money laundering. Karen Coleman signed the indictment for the Government. A twelve-count superseding indictment was issued on November 2, 2005.

---

[2] Govar testified that the records of his office show that he assigned Karen Coleman to the case when the file was opened on July 3, 2003. Vena testified that he handled the investigation of Clay, Nealy, and McCuien until the Axciom investigation began in mid-August of 2003. For purposes of this motion, the Court will accept Hays's testimony that Govar removed Vena from the case and transferred it to Coleman in December 2003.

After the Court scheduled an evidentiary hearing on Clay's motion, the Office of the United States Attorney for the Eastern District of Arkansas recused, and the Department of Justice reassigned the prosecution of this case to the Office of the United States Attorney for the Western District of Arkansas.

## II.

### A.    Motion to Dismiss

Clay moves to dismiss the indictment for two reasons: that the indictment is insufficient and that he is being prosecuted in retaliation for his representation of Edelmann.

### 1.    Sufficiency of Indictment

Clay first argues that the indictment is insufficient because it fails to allege a material falsehood or misrepresentation. An indictment is normally sufficient unless no reasonable construction can be said to charge the offense. *United States v. Morris*, 18 F.3d 562, 568 (8th Cir. 1994). "[A]n indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." *Hamling v. United States*, 418 U.S. 87, 117, 94 S. Ct. 2887, 2907, 41 L. Ed. 2d 590 (1974). An essential element of wire fraud (18 U.S.C. § 1343) is that the misrepresentation or falsehood involved must be "material." *Neder v. United States*, 527 U.S. 1, 20, 119 S. Ct. 1827, 1839, 144 L. Ed. 2d 35 (1999). A misrepresentation or falsehood is "material" if it has any "natural tendency to influence, or was capable of influencing, the decision of the decision making body to which it was addressed." *United States v. Henderson*, 416 F.3d 686, 692 (8th Cir. 2005) (quoting *Kungys v. United States*, 485 U.S. 759, 770, 108 S. Ct. 1537, 1546, 99 L. Ed. 2d 839 (1988)).

The superseding indictment describes the conspiracy to commit wire fraud as follows:

1. Defendants RAYMOND NEALY and DONNY McCUIEN would solicit persons to purchase homes and apply for loans for those homes through Ideal Mortgage.

2. Defendants ALVIN CLAY and RAYMOND NEALY would create or would cause to be created false invoices showing construction work to be done on the homes after the purchases. The invoices were false because no construction work was performed or was scheduled to be performed by Clay Construction Company. The invoices would be sent to the title companies, and the invoice totals would be included in the loan amounts paid by the title companies at the time of closing.

3. Defendant RAYMOND NEALY would solicit funding of the loans from lending institutions or mortgage companies outside the State of Arkansas. Those lending institutions would wire transfer the loan proceeds to the title companies utilized for the closing of the loans. At the time of closing, or soon thereafter, the title company would provide money to Clay Construction Company as payment of the fraudulent construction invoices.

4. Defendant ALVIN CLAY would cause the money paying the fraudulent construction invoices to be deposited in the bank account of Clay Construction Company.

5. Defendant ALVIN CLAY would write checks from the Clay Construction Company account to DONNY McCUIEN and/or McCuien Property Management for a portion of the monies received from the title companies.

6. Defendant DONNY McCUIEN would then cash the checks to McCuien property management.

Clay argues that these allegations fail to identify anyone who was deceived by the allegedly false construction invoices. According to Clay, nothing in the indictment alleges a prior agreement or promise between the defendants and any of the buyers, sellers, or lenders that construction work would actually be done by Clay Construction on the homes. Absent such an agreement, Clay argues, no party would have relied on the invoices. He argues that the lenders could not have relied on the invoices inasmuch as the lending decisions were made before the invoices were sent. Clay says that

the buyers were present at closing, knew that funds were disbursed to Clay Construction, and did not object. Thus, according to Clay, the invoices—even if no work were done—could not have been material misrepresentations as to any of the buyers, sellers, or lenders. Clay argues that it is therefore impossible for the Government to prove an essential element of each wire fraud count in the indictment.

The indictment does not specifically mention a prior agreement between the defendants and either the buyers, sellers, or lenders that construction work was to be done on any of the homes. While the indictment is not a model of clarity in this regard, it reasonably can be read to allege that the invoices were material misrepresentations meant to deceive the lenders. An invoice is an itemized list of goods or services furnished by a seller to a buyer, usually specifying the price and terms of sale. BLACK'S LAW DICTIONARY 846 (8th ed. 2004). Thus, a reasonable construction of the indictment is that each invoice acted as a statement that goods or services had been provided pursuant to an antecedent agreement. Clay says that the Court "should presume the regularity of the closing proceedings."[3] Clay has attached as Exhibit 2 to his motion three documents entitled "Offer(s) to Purchase Real Estate," which served as the real estate contracts for three transactions charged as fraudulent in the superseding indictment. To take one example, the real estate contract for 1614 South Park states the purchase price to be $75,000, of which $32,500 would be paid to the seller at closing and "Clay Construction will be owed the rest of the remainder balance due to the rehabilitation of the property." The superseding indictment describes the transaction as follows:

1.      In or about the Summer of 2002, RAYMOND NEALY and DONNY MCCUIEN met with a person known to the Grand Jury (Seller 1) regarding

---

[3] Defendant Alvin Clay's Omnibus Motion to Dismiss 6 n.3.

purchasing a residence located at 1614 South Park Street in Little Rock, Arkansas (Property 1).

2.      In or about the Summer of 2002, RAYMOND NEALY negotiated the purchase of the property.  NEALY told Seller 1 that construction work would be done after the house was sold.  The agreed upon purchase price was $32,500.  No construction work was done on the residence prior to closing by Seller 1, and Seller 1 did not hire Clay Construction to do any construction work.

3.      In or about the summer of 2002, RAYMOND NEALY approached a person known to the Grand Jury (Buyer 1) regarding purchasing Property 1.  RAYMOND NEALY made arrangements for Buyer 1 to obtain a mortgage loan for the property.

4.      On or about August 27, 2002, RAYMOND NEALY gave $5,500 to Buyer 1.  Buyer 1 placed the money into his/her account at Arkansas Federal Credit Union, obtained a transaction report showing the deposit of the money and the balance of the account, and immediately withdrew the funds.  Buyer 1 returned the money to RAYMOND NEALY.

5.      On or about August 27, 2002, RAYMOND NEALY caused a Uniform Residential Loan Application to be faxed to First Banc Mortgage in Tustin, California, the lending institution.  The application showed an inflated balance in Buyer 1's account at Arkansas Federal Credit Union.

6.      On or about August 28, 2002, ALVIN CLAY caused an invoice to be faxed to the Stewart Title, the title company responsible for closing the loan.  The invoice showed that $34,339.37 was owed to Clay Construction for completed rehabilitation work for Property 1.

7.      On or about August 28, 2002, First Banc Mortgage wired loan proceeds in the amount of $56,742.72 to a bank account of the title company so the title company could disburse the funds.

8.      On or about August 28, 2002, closing of the loan occurred at Stewart Title in Maumelle, Arkansas.  RAYMOND NEALY was present with Buyer 1.

9.      On or about August 28, 2002, a check was issued to Clay Construction for $33,939.51 from the title company for payment of the Clay Construction invoice referenced in paragraph 6.

10.     On or about August 28, 2002, ALVIN CLAY endorsed the check referenced in paragraph 9 and caused it to be deposited into the Clay Construction checking account.

11.     On or about August 28, 2002, ALVIN CLAY withdrew $33,939.51 from the Clay Construction Account in the form of cash.

12.     On or about August 28, 2002, ALVIN CLAY caused three cashier's checks to be issued to the mother of RAYMOND NEALY.  The amount of the cashier's checks were $9,000, $4,339.51, and $9,000.

13.     On or about August 28, 2002, the mother of RAYMOND NEALY deposited $13,339.51 into her account at Arkansas Federal Credit Union.

14.     On or about August 28, 2002, DONNY MCCUIEN gave Buyer 1 $2,000.

15.     From on or about August 28, 2002 until the date of this Indictment, Clay Construction did not perform any rehabilitation work on Property 1.

It would have been clearer had the indictment explained that the real estate contract provided to the lender and the closing agent showed that Clay Construction had rehabilitated or would rehabilitate the house, but that omission is not fatal.  As Clay himself argues, the Court can assume the regularity of the closing proceedings.  In the regular course of business for a sale of a house financed through a mortgage lender, the real estate contract would be provided to the lender, which would fund the transaction based in part on the real estate contract, and to the closing agent, who would close the transaction based on the real estate contract and any subsequent instructions to which all parties agreed.  The closing agent would not disburse 50% or more of the loan proceeds to a construction company (as allegedly happened in the transaction involving 1614 South Park Street) without permission from the lender.  Thus, presuming the regularity of the proceedings, the lender must have reviewed the real estate contract and approved the disbursement to Clay Construction contemplated by that contract on the assumption that the rehabilitation had been or would be done.  Presuming the regularity of the proceedings, the indictment can reasonably be read to allege that the invoice is a material misrepresentation because it constituted a representation that the construction work had been completed pursuant to the real estate contract.

11

In the ordinary course of business, a provider of goods or services would not send an invoice to someone unless, first, the provider and the recipient of the invoices had already agreed that goods or services would be provided for a certain price, and, second, the goods or services had actually been provided.  It would be an unusual practice for a seller to send an invoice to someone who had not agreed to purchase the invoiced goods or services, just as it would be unusual to send an invoice without the invoiced goods or services having been furnished.  Thus, even though the indictment does not specifically mention a prior agreement to do the construction work, such an agreement is reasonably implied in the allegations that construction invoices were sent to the closing agents, who then disbursed funds to pay those invoices.  Contrary to Clay's argument, it is not impossible for the Government to prove that the construction invoices were material misrepresentations.[4]

The indictment contains the elements of the offense charged; fairly informs Clay of the charges against which he must defend; and enables him to plead an acquittal or conviction in lieu of future prosecutions for the same offense.  The indictment is sufficient.

## 2.    Vindictive Prosecution

Clay's second ground for dismissal of the indictment is that the prosecution is vindictive, so the indictment must be dismissed in the interest of justice.  Clay argues that the United States brought this indictment against him in retaliation for his defense of Edelmann.  Dismissal of an indictment is an "extraordinary step."  *United States v. Stokes*, 124 F.3d 39, 44 (1st Cir. 1997).

---

[4] Clay attaches significance to the fact that wire fraud, and not bank fraud, was charged. According to Clay, if the lenders had been deceived by the invoices, then the Government would have charged bank fraud and not wire fraud.  The sufficiency of an indictment depends on what crimes are actually charged, not on what might have been charged.  *See DePugh v. United States*, 401 F.2d 346, 351 (8th Cir. 1968).  Because the indictment can be reasonably construed to allege a material misrepresentation on each of the wire fraud counts, the indictment will not be dismissed as insufficient.  *Morris*, 18 F.3d at 568.

Ordinarily, a facially valid indictment returned by a duly constituted grand jury calls for a trial on the merits. *See Costello v. United States*, 350 U.S. 359, 363, 76 S. Ct. 406, 408-09, 100 L. Ed. 397 (1956). An indictment brought in retaliation for a defendant's exercise of a legal right, however, violates due process. *United States v. Leathers*, 354 F.3d 955, 961 (8th Cir. 2004). The defendant has the heavy burden to show that the prosecution brought the indictment in order to punish him for the exercise of a legal right. *Id.*

A defendant may prove a vindictive or improper motive either by direct or circumstantial evidence. *Id.* A defendant may prove through objective evidence that the prosecutor's decision was intended to punish him for the exercise of a legal right. *United States v. Beede*, 974 F.2d 948, 951 (8th Cir. 1992). A defendant may also prove vindictiveness using circumstantial evidence; in certain cases, vindictiveness will be presumed from the circumstances if a reasonable likelihood of vindictiveness exists. *United States v. Goodwin*, 457 U.S. 368, 373, 102 S. Ct. 2485, 2488, 73 L. Ed. 2d 74 (1982); *United States v. Rodgers*, 18 F.3d 1425, 1429 (8th Cir. 1994). If the defendant provides sufficient evidence to take the question of vindictive prosecution past the frivolous state and raise reasonable doubt as to the prosecutor's purpose, the Court may hold an evidentiary hearing on the issue. *United States v. Kelley*, 152 F.3d 881, 885 (8th Cir. 1998).

Two concerns prompted this Court to hear evidence on the issue of vindictive prosecution. First, Vena initiated the investigation into Clay while he was opposing Clay in the acrimonious proceedings in *Edelmann*. Second, Vena told Brown that "Clay needed to be careful in his representation of Ms. Edelmann." After hearing the evidence, this Court is convinced that a finding of vindictive prosecution in this case is not warranted.

The timing of a federal prosecution alone "cannot change [a] legitimate exercise of normal prosecutorial discretion into a vindictive prosecution." *United States v. Jarrett*, 447 F.3d 520, 528 (7th Cir. 2006) (quoting *United States v. Dickerson*, 425 F.2d 1245, 1252 (7th Cir. 1992)).  Here, the evidence shows that the timing of the Clay investigation—as well as Vena's participation in the investigation—was a matter of coincidence, not of retaliation.  It happened that, while the *Edelmann* case was proceeding, Wright became concerned that he might face criminal charges for his involvement with Nealy, McCuien, and Clay.  Wright went to Leverett for help.  Leverett called Vena, with whom he happened to be working at the time on a pretrial diversion for Clyde Kelly.  Leverett told Vena that he had another individual who "wanted to get straight with the Government" and come in and talk.  Vena then set up a meeting with Leverett, Wright, and the FBI.  When Vena called the FBI after talking with Leverett, he asked if anyone had a case involving Nealy.  Hays responded because he had just interviewed Nealy concerning an unrelated matter.  Neither Hays nor Vena knew about Clay's involvement until the first meeting with Wright.[5]

The evidence does not show that the initiation of the investigation against Clay was a result of any personal rancor spilling over from the *Edelmann* proceedings.  Neither Wright nor Vena had any prior contact before the first meeting,[6] which took place at Wright's, and not the Government's,

---

[5] Clay gives significance to the fact that a case was opened on July 3, two days after the initial meeting with Wright, in arguing that the prosecution of Clay was vindictive. Clay argues that Vena did not have enough information from which to assess the credibility of Wright to be able to open a case against Clay two days later.  The circumstances surrounding Wright's meeting with Vena and Wright's statement itself, however, provided enough information from which to assess the credibility of Wright for the purpose of opening an investigation, which is far short of going to a grand jury and requesting an indictment.  *See infra* Part II.B.2 (discussing Wright's credibility as an informant).

[6] While Leverett testified that he believed Wright had been in contact with the Government before Wright asked him to set up a meeting with federal officials, both Wright and Vena testified that they had not met each other prior to the first meeting at Vena's office.  The

behest.  Wright implicated three individuals, of whom Clay was only one.  Initially, Clay was not the focus; according to Leverett, it was only until "further along" that Wright revealed the depth of his allegations against Clay.

The progress of the Clay investigation from its inception to the search of Clay's offices does not show a retaliatory motive.  Hays sent Vena a first draft of his search warrant affidavit in October 2003, but Vena did not respond.  Hays again contacted Vena a month later about reviewing his affidavit, but Vena told Hays that he did not have time to look at it.  Hays let another month pass before he spoke to Govar in December of 2003 about Vena not reviewing his affidavit.  Govar told Hays that Vena was too busy to review the affidavit.  According to Hays, at that point, Govar took Vena off the case and transferred it to Gardner.  Hays's search warrant was then approved and Clay's offices were searched in January of 2004.  That Vena did not take the time to review the affidavit for the search warrant is wholly inconsistent with Clay's theory that Vena was hell-bent on revenge.

Vena's statement to Brown does not prove vindictive prosecution.  Vena testified that he became concerned that Clay was not sufficiently cautious with Edelmann when the writing style of the pleadings Clay submitted abruptly changed and, simultaneous with that change, two motions signed by Edelmann for Clay were filed followed by identical motions signed in Clay's name.  Brown's testimony corroborated that Vena had expressed concern about Edelmann signing motions on behalf of Clay.  Edelmann's signing of the motions for Clay was, in and of itself, certainly unusual.  Coupled with the changed tone of the pleadings and Vena's opinion that Edelmann was wholly untrustworthy, that Edelmann apparently was filing motions and briefs over Clay's signature

Court specifically credits Vena's testimony, which was the most detailed as to how the contacts between Wright and the Government originated and, as mentioned above, was aided by review of documents that Leverett did not have when he testified.

15

without him having reviewed them gave Vena legitimate cause for concern about whether Clay was sufficiently cautious with Edelmann. From Vena's perspective, Clay was allowing an "unmitigated liar" (as Vena believed Edelmann to be) to draft motions and then sign those motions without Clay reviewing them, thereby potentially opening himself up to sanctions if those motions advanced "frivolous or improper arguments." *McCoy v. Court of Appeals of Wis., Dist. 1*, 486 U.S. 429, 435, 108 S. Ct. 1895, 1900, 100 L. Ed. 2d 440 (1988).

The manner in which Vena delivered the statement that "Clay needed to be careful in his representation of Ms. Edelmann" is consistent with Vena's testimony that his statement had to do with Clay's need to be careful with Edelmann rather than a threat that he would prosecute Clay if Clay did not retreat from vigorous representation of Edelmann. Vena had known Brown for more than twenty years and had a friendly relationship with him. Vena chose to convey his message through Brown—rather than confront Clay or bring the issue before the court—because he wanted to deliver his cautionary message in a non-threatening manner. Because Vena's statement, viewed in context, does not show malice toward Clay or a threat to retaliate against him, it does not prove that the subsequent prosecution of Clay is vindictive.

In response to a direct question by the Court, Vena stated under oath that he did not initiate the investigation of Clay as retaliation for Clay's conduct in the *Edelmann* case. The Court believes Vena. Clay has not shown that Vena should be disbelieved.

In his supplemental brief, Clay advances a new theory of vindictive prosecution that centers on Govar. In his supplemental brief, Clay argues for the first time that Govar was the driving force behind the investigation of Clay because he was angry at Clay for having previously represented Roy Lee Russell, an informant whose perjury led to the dismissal of 30 drug indictments. This theory

has no merit for two reasons.  First, merely alleging that Govar was angry at Clay is not enough to establish vindictive prosecution.  *See United States v. Hirsch*, 360 F.3d 860, 864 (8th Cir. 2004). Second, the theory gives Govar a greater role in the investigation of Clay than the evidence supports. As chief of the criminal division, Govar's participation in Clay's investigation was limited to assigning the case; assisting Coleman (at her request) when Clay asserted his Fifth Amendment privilege before the grand jury; and reviewing Hays's warrant affidavit for legal sufficiency, a standard procedure before searching a sensitive area like an attorney's office.  There is no evidence that Govar initiated the contacts with Wright, participated in the substantive development of the investigation, or participated in the ultimate decision to indict Clay.  Absent such a showing of effect on the decision to prosecute, Clay's theory of vindictive prosecution involving Govar must be rejected.  *Cf. Leathers*, 354 F.3d at 962 ("[T]here has been no showing that Ms. Connelly's presence had any effect on the federal prosecutors' decision to seek an indictment against Leathers.").

Clay's motion to dismiss on the grounds of vindictive prosecution is denied.

**B.     Motion to Suppress**

**1.        Veracity of Warrant Affidavit**

Clay argues that any evidence seized during the January 16, 2004, search of his offices should be suppressed on three grounds.  First, Clay asks this Court to apply the rule of *Franks v. Delaware*, 438 U.S. 154, 98 S. Ct. 2674, 57 L. Ed. 2d 667 (1978), and suppress the evidence seized during the search of his offices because Hays included intentional misrepresentations in his warrant affidavit and intentionally omitted information necessary for the magistrate's determination of probable cause. "Police cannot obtain valid search warrants where they knowingly or recklessly provide misinformation to a magistrate who issues a warrant, unless probable cause exists when the affidavit

17

is properly reconstructed with truthful information." *United States v. Salter*, 358 F.3d 1080, 1085 (8th Cir. 2004). Because search warrants are presumed valid, the defendant bears the burden of proving the intentional or reckless inclusion of misrepresentations in a warrant affidavit. *United States v. Ozar*, 50 F.3d 1440, 1443 (8th Cir. 1995). The defendant must prove that (1) a false statement was intentionally or recklessly included by the affiant in the warrant affidavit and (2) with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause. *United States v. Rivera*, 410 F.3d 998, 1000-01 (8th Cir. 2005).

Clay alleges several intentional misrepresentations in Hays's warrant affidavit. First, Clay argues that the statement "Clay Construction was not a real company" was an intentional misrepresentation because, had Hays done due diligence, he would have learned that Clay Construction had a valid contractor's license. Hays had already checked the Arkansas Secretary of State's website, however, and learned that Clay Construction had its corporate license revoked in 2002 for failure to pay franchise taxes. Hays testified that he thought that a legitimate company would not make the mistake of letting its license lapse by not paying franchise taxes. Hays stated that he chose not to go to the Contractors Licensing Board because that might have compromised the secrecy of the investigation. No evidence shows that Hays intentionally misrepresented the facts as to Clay Construction.

Second, Clay challenges the statement that "[Wright]'s relationship with Nealy began in the early part of 2002 and ended in approximately September of 2002." Clay tries to show that the relationship did not end in September of 2002 by noting that Wright drew a map of Nealy's offices in 2003 and listed the names of Nealy's employees; that the affidavit describes Wright speaking of "properties" and "invoices" even though only one property in the Indictment had been sold before

18

September of 2002; that the 1099 forms that Wright prepared were for the 2002 tax year, and therefore would have been produced after September of 2002; that a false tax document dated May 13, 2003, was prepared for Nealy by Coretta Richmond about which Wright had knowledge; and that Wright took an undercover FBI agent to meet with Nealy in Nealy's office sometime after September of 2002. Assuming that the statement Wright's relationship with Nealy ended in September 2002 is false, setting that statement aside would not render the affidavit insufficient to establish probable cause. Striking that statement from the affidavit would have no effect on its sufficiency to establish probable cause.

Third, Clay challenges the description[7] of the overall scheme of using false invoices to defraud the lending institutions contained in the warrant affidavit. While Clay disagrees with this description, especially as to how it sets forth the role of the appraisers, he offers no evidence to show that the description was intentionally false.

Fourth, Clay argues that the statements regarding Wright producing "false 1099s" for Clay were misrepresentations. Clay contends that those statements misled the magistrate because they were intended to make the magistrate believe that Clay might have violated the tax laws in 2001 and 2002 by filing false returns. Clay asserts that Hays knew that Clay had not filed tax returns in 2001 and 2002, so he was therefore aware that Clay could not have violated any tax law for filing false documents.[8] While Hays wrote in the warrant affidavit that the IRS certified that Clay did not file

---

[7] Clay argues that Hays's affidavit recites two alternate theories of how the scheme to defraud the lending institutions operated. The paragraphs of the affidavit excerpted by Clay in his brief are not alternate theories of the scheme; rather, they describe one theory, though different aspects of the scheme are highlighted in each paragraph.

[8] In his brief, Clay speaks of tax returns for Clay Construction, not Clay's personal returns. The Court assumes this was a mistake, as the subsequent testimony of Hays at the hearing centered around Clay's personal returns for 2001 and 2002.

a tax return for 2001, there is no evidence that Hays knew that Clay had not filed a return in 2002.[9]

Thus, the proof does not show that Hays intentionally misled the magistrate.

Clay also alleges that Hays omitted crucial information from his affidavit in support of the search warrant. Clay argues in his supplemental brief that the inclusion of the statements about the "false 1099s" misled the magistrate because Hays did not describe in the affidavit exactly how Wright reached the conclusion that the 1099s were false, i.e. that Wright was never told explicitly to prepare false 1099s but concluded that they were false when McCuien told him that Clay Construction did not repair any of the homes and existed solely to free up money paid by the lenders. To prevail on a *Franks* claim based on omissions of fact, a defendant must prove (1) that facts were omitted with the intent to make, or in reckless disregard of whether they make, the affidavit misleading; and (2) that the affidavit, if supplemented by the omitted information, could not support a finding of probable cause. *United States v. Allen*, 297 F.3d 790, 795 (8th Cir. 2002). Here, even if the reasoning for Wright's conclusion were included in the affidavit, there would have remained a "fair probability" that evidence of fraud was in Clay's offices. *See United States v. Stropes*, 387 F.3d 766, 771-72 (8th Cir. 2004). Clay also argues that Hays misled the magistrate by failing to inform him in the affidavit that Wright only spoke to Clay two or three times "in passing," but, again, the inclusion of such information would not have changed the probable cause determination.

---

[9] The warrant affidavit states that "[t]he IRS has not sent an answer for the 2002 returns at this time." At the hearing, Hays testified that he was not sure whether the letter the IRS sent Vena in September of 2003 stated that the IRS could not locate Clay's 2002 return or rather stated that Clay's 2002 return did not exist. Clay's counsel asked the Government to produce that letter. The Court ordered the Government to turn it over to Clay and stated that Clay's counsel could file it with the Court if he saw fit to do so. As of the date of this Opinion and Order, the Court has not received that letter.

Even if Clay could show that any or all of the above statements in Hays's affidavit were false, he has not shown that any of them were made "knowingly and intentionally, or with reckless disregard for the truth." *United States v. Wells*, 223 F.3d 835, 838 (8th Cir. 2000). Similarly, there is no evidence from which to conclude that Hays intended to mislead the magistrate by leaving out the details that Clay alleges should have been included. *Allen*, 297 F.3d at 795. Clay's first argument for suppression therefore fails.

### 2.    Credibility of Informant Wright

Clay's second argument for suppression is that Wright was not credible, and the information he provided the Government therefore could not be used as the basis for probable cause. A search warrant is valid under the Fourth Amendment if it establishes probable cause. *United States v. Carpenter*, 422 F.3d 738, 744 (8th Cir. 2005). "Probable cause exists when the affidavit sets forth facts sufficient to create a fair probability that evidence of a crime will be found in the place to be searched." *Wells*, 223 F.3d at 838. The existence of probable cause is determined through making a "practical, commonsense" evaluation of the "totality of the circumstances." *Illinois v. Gates*, 462 U.S. 213, 238, 103 S. Ct. 2317, 2332, 76 L. Ed. 2d 527 (1983). "When the affidavit is based substantially on information provided by an informant, evidence of the informant's reliability, veracity, and basis of knowledge is highly relevant to the probable cause determination." *United States v. Ketzeback*, 358 F.3d 987, 991 (8th Cir. 2004). Here, because the warrant affidavit sufficiently demonstrated Wright's veracity and the basis of his knowledge, the magistrate correctly relied on Wright's information to establish that probable cause existed.

Hays presented sufficient facts in the warrant affidavit to confirm Wright's credibility to the magistrate judge. Wright was no anonymous tipster. He met with officers in person on at least three

different occasions and thereby gave the officers an opportunity to assess his credibility. *Carpenter*, 422 F.3d at 744. Wright also implicated himself by admitting to the FBI that he had falsified tax documents and participated in the mortgage-fraud scheme by preparing false construction invoices. These admissions against interest further strengthen his credibility. *United States v. Harris*, 403 U.S. 573, 583-84, 91 S. Ct. 2075, 2082, 29 L. Ed. 2d 723 (1971); *see also United States v. Pennington*, 287 F.3d 739, 742 (8th Cir. 2002) (fact that an informant implicated himself in criminal activity to the police supports a finding of probable cause to search).

The basis of Wright's knowledge concerning the alleged illegal activities of Clay, Nealy, and McCuien was also adequately demonstrated in the warrant affidavit. Wright provided the names of Clay and his coconspirators, the names of the businesses involved in the conspiracy, and both the layout and address of the offices of Clay and Nealy. Wright had Clay's social security number. Wright also provided some documentation of the alleged illegal activity to the FBI, including lists of information Nealy gave Wright to use for preparing false tax returns, a false W-2, and two pay stubs. Hays corroborated the names of the businesses involved in the conspiracy and the address of their offices.

While Wright's recounting of the conspiracy to commit wire fraud may be hearsay, the warrant affidavit revealed that the hearsay had a reliable basis. Wright said that he received his information about the conspiracy from McCuien, whose admission was against his own interest. *See Spinelli v. United States*, 393 U.S. 410, 425, 89 S. Ct. 584, 593, 21 L. Ed. 2d 637 (1969) (White, J., concurring) ("[I]f . . . the informer's hearsay comes from one of the actors in the crime in the nature of an admission against interest, the affidavit giving this information should be held sufficient."); *See also* FED. R. EVID. 804(b)(3). Further, Hays attempted to corroborate McCuien's statement that

22

Clay Construction was "not a real company" by checking the Arkansas Secretary of State's website, where he learned that the corporate charters for both Clay Real Estate and Clay Construction had been revoked. The double hearsay contained in the warrant affidavit therefore had a sufficiently reliable basis for use by the magistrate in his determination that there was probable cause. *United States v. Satterwhite*, 980 F.2d 317, 322-23 (5th Cir. 1992). The warrant affidavit sufficiently established Wright's credibility. Clay's second argument for suppression is also rejected.

###### 3.     Breadth of Search Warrant

Clay argues that the evidence discovered from the search of Clay's offices should be suppressed because the search warrant was overbroad. While the warrant was sought for Clay Law Office and Clay Real Estate, Clay contends that there was no information in the affidavit regarding possible criminal violations involving these two entities. Therefore, Clay argues, the Government's search of them exceeded the scope of the warrant affidavit. This argument presupposes that Clay Law Office and Clay Real Estate were distinct entities from Clay Construction, the office of which could be separately searched. The warrant affidavit indicates that they were not, as Clay Construction did not have an office apart from Clay Law Office and Clay Real Estate. Clay, as the owner-operator of those three entities, could have placed the information that the warrant affidavit sought anywhere within his control—that area being the extent of Suite 1050 of the Tower Building. The warrant affidavit properly defined the scope of the search as Suite 1050 of the Tower Building, and the Government properly searched that specific area. Clay's motion to suppress the evidence seized during the January 16, 2004, search of his offices is denied.

**C.      Motion for Severance**

Clay argues that, pursuant to Federal Rule of Criminal Procedure 14(a), his trial should be severed from the trials of his codefendants Nealy and McCuien because a joint trial would prejudice him.  Rule 14(a) states:

> If the joinder of offenses or defendants in an indictment, an information, or a consolidation for trial  appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires.

Generally, it is preferable that coconspirators be tried jointly, "particularly where proof of the charges against the defendants is based upon the same evidence and acts."  *United States v. Blaylock*, 421 F.3d 758, 766 (8th Cir. 2005).  "Because defendants who are jointly indicted on similar evidence from the same or related events should, in most instances, be tried together, a defendant seeking severance must show 'real prejudice.'"  *Id*.  "Real prejudice" is more than the mere fact that a defendant would have had a better chance for acquittal had he been tried separately.  *Id*.  According to the Eighth Circuit, "real prejudice"

> can be demonstrated by showing that the jury will be unable to compartmentalize the evidence as it relates to the separate defendants because of a "prejudicial spillover effect."  The burden of showing a clear likelihood of prejudice falls on the party seeking severance.
> Trying codefendants together not only conserves scarce time and resources, but also "gives the jury the best perspective on all of the evidence and therefore increases the likelihood of a correct outcome."  Severance is never warranted simply because the evidence against one defendant is more damaging than that against another, even if the likelihood of the latter's acquittal is thereby decreased.  What is required for a severance is a specific showing that a jury could not reasonably be expected to compartmentalize the evidence.

*United States v. Hively*, 437 F.3d 752, 765 (8th Cir. 2006) (internal citations omitted).  "Limiting instructions are generally sufficient to prevent real prejudice."  *United States v. Pospisil*, 186 F.3d 1023, 1030 (8th Cir. 1999).

24

Here, the proof of the charges against Clay, Nealy, and McCuien will be based, in large part, upon the same evidence. Except for counts seven and eight, which do not mention McCuien, the transactions alleged in the superseding indictment are the same for each of the defendants, so much of the proof will be common to them. Thus, the defendants should be tried together.

Clay has not made a showing of "real prejudice" to undermine this conclusion. Clay's statement that there is more evidence against his codefendants than there is against him does not demonstrate "real prejudice." Separate trials are not required "just because the quantum of proof against each defendant is unequal" or "because each defendant did not participate in every act constituting the joined offenses." *United States v. Kaminski*, 692 F.2d 505, 520 (8th Cir. 1982). While Clay asserts that he has several different defenses that he will be able to raise at trial, Clay does not allege that these defenses will be antagonistic to the defenses raised by Nealy and McCuien. *See, e.g.*, *United States v. Joiner*, 418 F.3d 863, 868-69 (8th Cir. 2005); *United States v. Reeves*, 730 F.2d 1189, 1197 (8th Cir. 1984). Clay, in short, has provided no substantial reason as to why the jury cannot be expected to "compartmentalize the evidence" that relates to him at trial. *United States v. Jones*, 880 F.2d 55, 63 (8th Cir. 1989). Clay's motion for severance is therefore denied.

**D.    Motion for Discovery and Inspection**

Clay lists several items of information in his brief that he argues the Government should be ordered to disclose under *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), and *Giglio v. United States*, 405 U.S. 150, 92 S. Ct. 763, 31 L. Ed. 2d 104 (1972). Clay first argues that he is entitled to detailed information about Kenny Wright's immunity arrangement with the Government. Wright's immunity arrangement with the Government is information for use on cross-examination to challenge his credibility. *See Giglio*, 405 U.S. at 154-55, 92 S. Ct. at 766; *United*

*States v. Higgs*, 713 F.2d 39, 43 (3d Cir. 1983).  This Court's January 6, 2005, Order (Document #39) states that the Government does not have to disclose *Brady* material that could only be used in the cross-examination of witnesses until the Government is required to provide Jencks Act information.  Jencks Act material, in turn, need not be produced by the Government until after the witness has testified on direct.  *See* FED. R. CRIM. P. 26.2; 18 U.S.C. § 3500(b).  Thus, this part of Clay's motion for discovery and inspection is denied, because Wright's immunity arrangements were already covered in the Court's previous order, and, according to that order, the time for the Government's disclosure of that information has not yet arrived.[10]  For the same reason, Clay's request for the prior arrest and conviction record of Wright is denied.[11]

Clay also requests statements that Wright made to Vena prior to July 1, 2003[12]; recorded conversations between Wright and investigative agents, Wright and Clay's employees, and Wright and other defendants; the statements and grand jury testimony of all buyers alleged in the indictment; the statements and grand jury testimony of all sellers alleged in the indictment; notes of Vena's meetings with Wright prior to July 1, 2003; notes Hays made during interviews with Wright and special agent Drew McCandless during the year 2003; names and notes of undercover investigative agents who accompanied Wright to an interview with Nealy in Nealy's office; and notes of Government investigators concerning any interviews with the sellers and buyers alleged in the indictment.  Clay argues that this information is exculpatory and therefore must be disclosed under

---

[10] The Government at the hearing gave Clay a copy of the letter granting Wright limited immunity for his July 1, 2003, proffer meeting with the Government.

[11] Wright testified at the hearing that he has never been in any trouble with the law.

[12] Vena and Wright both testified at the hearing that they had no contact before the first meeting on July 1, 2003.

*Brady* and *Giglio* because it is necessary to establish 1) the defense of vindictive prosecution; 2) a buyer-seller relationship; 3) the absence of any proof that Clay engaged in any fraudulent conduct; and 4) the absence of any evidence of knowledge and intent on the part of Clay regarding the construction scheme alleged in the indictment.

The information that Clay seeks is either witness information or internal governmental memoranda not ordinarily discoverable by a criminal defendant. *See* FED. R. CRIM. P. 16(a)(2). While *Brady* mandates that the Government turn over any evidence material to either guilt or punishment, Clay is not entitled to discovery of the information he seeks because he does not make a preliminary showing that the information is exculpatory. "There is no general constitutional right to discovery in a criminal case, and *Brady* did not create one . . . ." *Weatherford v. Bursey*, 429 U.S. 545, 559, 97 S. Ct. 837, 846, 51 L. Ed. 2d 30 (1977). "*Brady* is not a discovery rule, but a rule of fairness and minimum prosecutorial obligation." *United States v. Roach*, 28 F.3d 729, 734 (8th Cir. 1994). Before the defendant can require the Government to furnish him with information under *Brady*, the defendant must first make a preliminary showing that the requested information is exculpatory. *Id.*; *United States v. Krauth*, 769 F.2d 473, 476 (8th Cir. 1985). Merely alleging that the government is denying the defendant exculpatory information is not sufficient to warrant broad-scale discovery. *Krauth*, 769 F.2d at 476. Here, Clay is asking for sweeping discovery, but has provided no basis for the Court to determine that his requests are anything more than a grand "fishing expedition" to see if something exculpatory turns up. *United States v. Pou*, 953 F.2d 363, 367 (8th Cir. 1992). Clay's motion for discovery and inspection is therefore denied.

E.      **Motion in Limine**

Clay also moved in limine to exclude evidence that Clay asked Kenny Wright to fabricate

false 1099s, evidence concerning false and fraudulent loan applications, and evidence concerning

any material misrepresentations besides the construction invoices.  The record does not contain

enough information to show whether the evidence should be excluded.  Clay's motion in limine is

thereby denied with prejudice to Clay's right to file a motion in limine on these matters in the future.

F.      **Motion for Bill of Particulars**

Clay argues that he is entitled to a bill of particulars because the superseding indictment does

not adequately inform him of the specific acts that the Government will rely upon to demonstrate that

he had knowledge of a scheme to defraud and agreed to further the scheme.  For bills of particulars,

the general rule is that they should be used to inform a defendant of the nature of the charges against

him and to prevent or minimize the element of surprise at trial; they are not, however, to be used as

a discovery tool to provide detailed disclosure of the Government's evidence at trial.  *United States

v. Wessels*, 12 F.3d 746, 750 (8th Cir. 1993).  Furthermore, the Eighth Circuit has made clear that

if the indictment sufficiently informs the defendant of the nature of the charges, no bill of particulars

is needed.  *See, e.g.*, *United States v. Fleming*, 8 F.3d 1264, 1265-66 (8th Cir. 1993); *United States

v. Sileven*, 985 F.2d 962, 966 (8th Cir. 1993); *United States v. Buffington*, 578 F.2d 213, 214 (8th

Cir. 1978).  *But see* 1 CHARLES ALAN WRIGHT, ARTHUR R. MILLER, & EDWARD H. COOPER,

FEDERAL PRACTICE AND PROCEDURE § 129 (3d ed. 1999) ("The sufficiency of the indictment or

information is irrelevant in determining whether to order a bill of particulars.").

A bill of particulars is not necessary in this case because the superseding indictment is

reasonably specific about the acts forming the basis of the conspiracy.  *Cf. United States v. Hill*, 589

F.2d 1344 (8th Cir. 1979) (holding that no bill of particulars was necessary in prosecution for fraudulent acquisition of controlled substances where indictment informed defendant of the dates, places, and quantities involved in the charged counts).  The superseding indictment alleges with specificity the transactions that the Government contends were fraudulent.  Furthermore, most of the information that Clay requests is discovery to which he is not entitled.  Clay asks for the "particular acts and circumstances" on which the Government will rely to demonstrate that Clay had knowledge of a scheme to defraud and to obtain money by means of false representations, that he knowingly and intentionally became a member of a conspiracy, that he knew the loan proceeds he received and deposited in the Clay Construction bank account were proceeds of an illegal activity, and that he knew the transactions set forth in counts seven and eight of the indictment were designed to conceal the nature of the proceeds.  These requests appear to be attempts to become apprised of the details of the Government's evidence.  Clay's request for the "names of all-coconspirators, indicted or unindicted, known to the Government and their addresses at the time of their alleged participation in the alleged conspiracy" also appears to be a discovery request.  Because these requests are "discovery-oriented," the Government need not furnish Clay with a bill of particulars containing the above requested information.  *United States v. Hester*, 917 F.2d 1083, 1084 (8th Cir. 1990).

## CONCLUSION

For the reasons stated, Clay's motions are DENIED.  Document #64.

IT IS SO ORDERED this 7th day of August, 2006.

J. LEON HOLMES
UNITED STATES DISTRICT JUDGE