**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION**

UNITED STATES OF AMERICA

v.                                      No. 4:04CR00274-01 JLH

ALVIN CLAY

**OPINION AND ORDER**

On January 9, 2007, Alvin Clay filed a motion for reconsideration of the Court's January 4, 2007, Opinion and Order denying his motion to reconsider his original motion to dismiss the first superseding indictment on account of prosecutorial misconduct. The Court held two hearings on Clay's motion. Both parties have submitted supplemental briefs. For the following reasons, Clay's motion for reconsideration is denied.

**I.**

A brief history of the proceedings is necessary to understand Clay's present motion. Clay was indicted by a grand jury for one count of conspiracy to commit wire fraud, five counts of wire fraud, and six counts of money laundering. On November 2, 2005, Clay filed a motion to dismiss the first superseding indictment, a motion to suppress the evidence seized during a search of his offices, a motion to sever his trial from the trial of the other defendants, Donny McCuien and Raymond Nealy, a motion for discovery and inspection, a motion in limine, and a motion for a bill of particulars. In his motion to dismiss, Clay argued that the first superseding indictment should be dismissed because the prosecution was vindictive and brought in retaliation for his defense of Mary K. Edelmann in a criminal case prosecuted by Assistant United States Attorney George Vena. A hearing was held on Clay's motions on April 17, 2006, at which Robert Govar, the then-criminal division chief of the United States Attorney's Office, testified. In a supplemental brief filed after the

hearing, Clay advanced the theory that Govar was the driving force behind the vindictive prosecution of Clay because Govar was angry at Clay for having previously represented Roy Lee Russell, an informant whose perjury led to the dismissal of 30 drug indictments. The Court denied Clay's motions in an opinion dated August 7, 2006.[1]

On December 21, 2006, Clay filed a motion in which he asked the Court to reconsider his motion to dismiss the first superseding indictment for prosecutorial misconduct. In that motion, Clay argued that the Government presented perjured testimony to the grand jury. In an Opinion and Order dated January 4, 2007, the Court denied Clay's motion to reconsider.

Clay filed the present motion to reconsider the Court's denial of his motion to dismiss the first superseding indictment for prosecutorial misconduct on January 9, 2007. The Court conducted an evidentiary hearing that began on March 16, 2007, was recessed for additional discovery, and was reconvened and concluded on May 25, 2007. A new grand jury returned a second superseding indictment on June 6, 2007. Because a second superseding indictment was filed, the Government urges the Court to deny Clay's January 9 motion as moot. Whether or not Clay's motion is moot, the Court believes that when government misconduct is alleged those allegations should, whenever possible, be addressed on the merits. Clay's motion will be addressed on the merits and will be denied on the merits.

**II.**

Clay alleges prosecutorial misconduct in front of the grand jury and seeks dismissal of the charges against him with prejudice. "[G]rand jury proceedings are afforded a strong presumption

---

[1] The background facts of this case are presented in detail in that opinion. Document #127. They will not be reproduced here.

of regularity, and a defendant seeking to overcome that presumption faces a heavy burden." *United States v. Kouba*, 822 F.2d 768, 774 (8th Cir. 1987). "Where the defendant has alleged prosecutorial misconduct, dismissal of an indictment is proper only when the defendant demonstrates flagrant misconduct and substantial prejudice." *United States v. Wadlington*, 223 F.3d 1067, 1073 (8th Cir. 2000).

It is well-established law that a federal prosecutor is under no obligation to present exculpatory evidence to the grand jury. *United States v. Williams*, 504 U.S. 36, 51, 112 S. Ct. 1735, 1744, 118 L. Ed. 2d 352 (1992). Clay does not argue that the Government failed to present exculpatory evidence to the grand jury. Instead, he argues that the Government distorted exculpatory evidence so as to make it inculpatory and then presented the distorted evidence to the grand jury. The Government is charged with the duty to refrain from presenting perjured testimony to the grand jury knowingly. *United States v. Smith*, 552 F.2d 257, 261 (8th Cir. 1977). And the Government also has a duty not to mislead the grand jurors. *See Williams*, 504 U.S. at 69, 112 S. Ct. at 1753-54 (Stevens, J., dissenting) ("Requiring the prosecutor to ferret out and present all evidence that could be used at trial to create a reasonable doubt as to the defendant's guilt would be inconsistent with the purpose of the grand jury proceeding . . . . But that does not mean that the prosecutor may mislead the grand jury into believing that there is probable cause to indict by withholding clear evidence to the contrary."); *Smith*, 522 at 261. Clay cannot show, however, that the Government has violated either duty in this case.

Clay argues that FBI Agent Rodney Hays took statements by Jeron Marshall exculpating Clay that Hays recorded in his interview notes and made them inculpatory when Hays drafted his 302 report from his interview notes. Karen Whatley, the Assistant United States Attorney assigned to

3

Clay's case, based the narrative summaries that she presented to the grand jury on Hays's 302 reports. Because the changes Hays made to Marshall's statements that he recorded in his interview notes when he wrote his 302 report were carried over to the narrative summary of Marshall's testimony, Clay argues that the Government improperly misled the grand jury by presenting the narrative summary.

Hays's interview notes are just notes. They were not presented to the grand jury. They do not represent the sworn testimony of Marshall but only notes by which Hays could later call to mind what Marshall had told him. What is important is that in Marshall's grand jury testimony – the only sworn testimony of Marshall contained in the record, Marshall testified under oath that all the information contained in the narrative summary was true. Clay has not shown that Marshall's grand jury testimony was false or misleading in any way.

Furthermore, in the two instances where Clay alleges that Hays changed Marshall's statements about Clay from being exculpatory to inculpatory, the changes are insignificant. Hays wrote in his notes of Marshall's interview, "Alvin is a good attorney. If he felt it was questionable he would do something about it." Hays wrote in the 302 report, "Clay is a good attorney and if he felt that he was doing something questionable, he would do something about it." Hays also wrote in the interview notes, "I don't think it was a real company. He was going to subcontract work to Donny. All three confirmed that this is how it was happening." Then he wrote in the 302 report, "Marshall stated 'I don't think it was a real company.' Marshall believed this because of discussion she had with McCuien, Nealy, and Clay during the time she was employed there. Clay stated that McCuien was supposedly a subcontractor and was responsible for some of the work." These differences between the notes and the 302's hardly show an intent to mislead.

Even if Clay could show that Hays changed Marshall's statements from being exculpatory to inculpatory, the undisputed testimony of Whatley was that she had never seen Hays's interview notes. Whatley could therefore not have knowingly presented perjured or misleading testimony to the grand jury when she presented the narrative summary of Marshall's statements. *Cf. Bank of Nova Scotia v. United States*, 487 U.S. 250, 261, 108 S. Ct. 2369, 2377, 101 L. Ed. 2d 228 (1988) (finding no prosecutorial misconduct even where IRS agents gave misleading and inaccurate summaries to the grand jury because "the finding that the prosecutors knew the evidence to be false or misleading . . . [was] clearly erroneous"). Clay's assertion of prosecutorial misconduct with regard to Hays's re-writing of Marshall's statements fails.

**III.**

In addition to Hays's changes to his interview notes of Marshall, Clay asserts that Hays gave false testimony in four other instances that justify the dismissal of the first superseding indictment: (1) Hays stated that Clay and Nealy started the fraudulent scheme and McCuien was brought in only after the scheme was in operation, but Hays later became aware that McCuien "was more involved on the front end"; (2) Hays stated that Clay Construction never worked on any property of which he was aware, but Hays later learned that Graylon McFadden had worked on one project on behalf of Clay Construction unrelated to the properties that were the subject of the charges against Clay; (3) Hays stated that Clay had written checks to McCuien from the Clay Construction account but those checks "didn't total close to $70,000," when Clay had in fact written checks in the amount of $80,000 to McCuien; and (4) Hays testified that Clay received the vast majority of the $133,000 from the invoices submitted to the title companies even though he had evidence of the $80,000 in checks from Clay Construction to McCuien.

For an indictment to be dismissed on account of false testimony presented to the grand jury, the defendant must show prejudice amounting to either "proof that the grand jury's decision to indict was substantially influenced, or that there is 'grave doubt' that the decision to indict was substantially influenced, by testimony which was inappropriately before it." *United States v. Feurtado*, 191 F.3d 420, 424 (4th Cir. 1999) (citing *Bank of Nova Scotia*, 487 U.S. at 256, 108 S. Ct. at 2374). A district court may not dismiss an indictment for errors in grand jury proceedings unless such errors prejudiced the defendants. *United States v. Brooks*, 125 F.3d 484, 497 (7th Cir. 1997).

Here, none of Hays's inaccurate testimony warrants dismissal of the indictment. Clay has presented no evidence that Whatley knew that any of the above statements that Hays made were false. *Cf. Bank of Nova Scotia*, 487 U.S. at 261, 108 S. Ct. at 2377. It is undisputed that Hays did not know that the first two statements were untrue when he made them. That those statements were incorrect only became apparent after further investigation. Moreover, although Hays misspoke when he said that the checks from Clay Construction Company to McCuien totaled less than $70,000, Clay presented no evidence that the error was intentional or, for that matter, that the real import of the testimony was materially different from the truth as Hays described it at the May 25, 2007, hearing.

Moreover, Clay has failed to prove that any of the four remarks were prejudicial. Hays's first statement does not help Clay. Had the grand jury known that McCuien had been involved in the fraudulent scheme from the beginning, that evidence might have further inculpated McCuien, but it would not have shown or tended to show that Clay was not involved. As to Hays's second statement, Clay has not shown that the grand jury's decision to indict was substantially influenced by the testimony that Clay Construction Company had never done any work of which Hays was

aware. With regard to the checks written by Clay to McCuien, at the most recent hearing, Hays admitted that he misspoke when he said that those checks did not total even close to $70,000. In fact, the checks totaled $80,000. Hays also testified that McCuien had received a 1099 for approximately $72,000 and was not happy about having to pay taxes on that amount because that amount was greater than his income from these transactions. Hays testified that he believed that, after McCuien cashed these checks, McCuien, Clay and Nealy met and divided the cash so that, in fact, McCuien's income was less than the $70,000 reflected on the 1099. Clay has failed to show how this testimony, if presented precisely as Hays testified at the hearing, would have inclined the grand jury not to find that he participated in the alleged wire fraud. The allegations in the first superseding indictment relating to the checks provide:

> 5.     Defendant ALVIN CLAY would write checks from the Clay Construction Company account to DONNY MCCUIEN and/or McCuien Property Management for a portion of the monies received from the title companies.
>
> 6.     Defendant DONNY McCUIEN would then cash the checks to McCuien Property Management.

Clay has not shown how those allegations, or any allegations in the first superseding indictment, would have changed had Hays told the grand jury that Clay wrote McCuien $80,000 in checks from an account that was controlled by Clay and into which $133,000 in proceeds from the alleged wire fraud had been deposited; and that McCuien, Clay, and Nealy then divided the $80,000 represented by those checks. Clay has not shown that the decision to indict was substantially influenced by Hays's inaccuracy as to the amount of the checks that Clay wrote to McCuien. The first superseding indictment will not be dismissed.

## IV.

In his motion, Clay appears to reassert his theory of prosecutorial vindictiveness on the part of Govar. In the August 7, 2006, Opinion and Order denying Clay's motion to dismiss for prosecutorial misconduct, the Court had this to say about Clay's allegations of prosecutorial vindictiveness:

> [Clay's] theory [of prosecutorial vindictiveness on the part of Govar] has no merit for two reasons. First, merely alleging that Govar was angry at Clay is not enough to establish vindictive prosecution. *See United States v. Hirsch*, 360 F.3d 860, 864 (8th Cir. 2004). Second, the theory gives Govar a greater role in the investigation of Clay than the evidence supports. As chief of the criminal division, Govar's participation in Clay's investigation was limited to assigning the case; assisting [Whatley] when Clay asserted his Fifth Amendment privilege before the grand jury; and reviewing Hays's warrant affidavit for legal sufficiency, a standard procedure before searching a sensitive area like an attorney's office. There is no evidence that Govar initiated the contacts with Wright, participated in the substantive development of the investigation, or participated in the ultimate decision to indict Clay. Absent such a showing of effect on the decision to prosecute, Clay's theory of vindictive prosecution involving Govar must be rejected.

*United States v. Clay*, No. 4:04CR00274-01, 2006 WL 2265254, at *9 (E.D. Ark. Aug. 7, 2006). Clay now argues that the Court was misled by Govar's testimony at the April 17, 2006, hearing on Clay's original motion to dismiss and that Govar's participation in Clay's case was much greater than what the Court stated in its August 7 Opinion and Order. Clay claims that the grand jury transcripts and Govar's testimony at the May 25, 2007, hearing on this motion prove that Govar testified falsely at the April 17 hearing.

At the April 17 hearing, Govar testified:

Q.  Okay. By the way, do you – how does your grand jury setup work? Does every Assistant US Attorney handling a case do his own, his or her own grand jury presentation?

A.  Yes, sir. With some exceptions. Those exceptions might be if that attorney has got to be in a trial, there may be another AUSA that actually handles the presentation of a matter to the grand jury. We try to avoid that, but sometimes that has to be done that way.

Q.  Uh-huh. And on what basis do you get involved in cases personally?

A.  You mean presenting the case to the grand jury?

Q.  Yeah. Or trying a case or investigating a case.

A.  I typically do that in my cases only.

Q.  Only?

A.  Yes, sir.

Q.  Was this your case?

A.  No, sir.

Q.  You were present at the grand jury of Mr. Clay, were you not?

A.  I was present. I am present every month at the grand jury. One of my responsibilities, although that has changed over a period of time, is to always be at the grand jury to act as their legal advisor, to answer any legal questions that they may have that comes up from time to time.

Q.  I'm going to hand you a document that's not part of the – not made an exhibit. This court record is a copy of the grand jury proceeding that was on Mr. Clay's examination, provided us as part of the discovery in this case, and I am just going to ask – I am going to hand it to you for refreshing your recollection.

A.  Sure. Yes, sir.

Q.  Okay. I'll take that. I am not going to ask you any more questions from it. Just one question with regard to this grand jury proceeding, sir. It appears that you did present in this grand jury case, right, in Mr. Clay's case?

A.  No, sir. I didn't present anything. What happened in that particular proceeding was when Mr. Clay was actually testifying and there was a question that arose during the course of his examination dealing with whether

> he had complied with the grand jury subpoena by bringing some records and documents which had been requested by subpoena, I didn't – that's all that was about. It didn't have anything to do with presenting the case to the grand jury. We were just trying to determine whether Mr. Clay had the documents that the subpoena had requested.
>
> Q.   Why were you involved at all, sir?
>
> A.   Mr. Clay had invoked a Fifth Amendment privilege as to some of those records, it's my understanding, and I was just attempting to help AUSA Karen [Whatley] determine whether he had the records and whether he was invoking some Fifth Amendment privilege that applied to a corporate entity because corporations generally do not have a Fifth Amendment privilege.
>
> Q.   So you were just helping out?
>
> A.   Right. Trying to get clarification of what records he had and what – exactly what claim of privilege he was making.
>
> Q.   Did she request your assistance?
>
> A.   She did.
>
> Q.   She wasn't capable of ascertaining that, sir?
>
> A.   No. When someone invokes a privilege in a grand jury, that's a very sensitive area, and we try to be very careful how we handle that. And so I was assisting, trying to determine what the claim of privilege was and whether the documents requested by the subpoena covered – whether they were covered by that privilege.

In response to questioning at the May 25 hearing, Govar testified:

> Q.   Now, when you testified previously, were you aware – you were aware that you had asked questions, the questions you did ask, were you not?
>
> A.   Mr. Hairston, I'm not aware of what questions I asked in which investigation, because like I say, I was at every grand jury session, hundreds of cases were being presented. I couldn't possibly remember whether I asked a question in this case or that case. That's why we have transcripts of those proceedings, because I couldn't possibly remember what I asked in any given case.
>
> \* \* \*

Q.   At the time you said that you didn't present anything, that's what you say that you remembered doing?

A.   I didn't remember presenting anything, and I don't – I don't regard what I did in this matter as presenting a case.

Q.   Were you not shown a copy – in the previous session, sir, were you not shown a copy of your testimony and the questions you asked Alvin Clay in the grand jury, and from that you admitted that you had assisted Karen Whatley?

A.   I do recall seeing a transcript of the proceeding the day Mr. Clay was there to deliver documents pursuant to the grand jury subpoena.

Q.   But you denied doing anything else at the time. Right, sir?

A.   That's all I could remember doing at the time.

Q.   Weren't you adamant about, "No, sir, I did not present anything"? Were you not adamant?

A.   I'm still adamant. I don't think asking a few questions of a witness is presenting the case, Mr. Hairston.

Q.   That's not assisting in presenting the case, if you ask questions in the grand jury?

A.   Well, I've been presenting indictments for 27 years, and I know how to do it, and I know when I'm doing it, and I didn't consider myself presenting cases, or presenting this case to the grand jury. Ms. Whatley was doing that. If I asked a few clarifying questions of a witness, that's not presenting the case.

Q.   Uh-huh. And you were asking for your own clarification, not for the clarification of the grand jurors?

A.   Absolutely. And I have a right to do that.

Q.   And you couldn't get clarification by looking at the file, by looking at reports, or anything else?

A.   It wasn't my case. I didn't have the file and I didn't have reports.

Q.   Why was it necessary for you to get that clarification then?

11

A. Because I was the chief of the criminal division, and as I've mentioned, it was my responsibility to see that the case is moved along, and I needed to understand the cases. I needed to understand all the cases, not just Mr. Clay's case, but all the cases that were presented to the grand jury. And if I had questions about those cases, I would ask for clarification.

\* \* \*

Q. Well, the Court relied on your representations in that hearing, sir, in making findings as to your role in this case, and the Court, obviously, made a finding that was not supported by what you are saying today and by subsequent events when it was discovered that you had presented information to the grand jury. My question is, did you correct the Court or go back and make an amendment of your testimony to inform the Court that it was not completely accurate?

A. I believe my testimony was accurate, Mr. Hairston.

Q. So you're going to stand on that?

A. Yes, I am.

\* \* \*

CROSS-EXAMINATION

BY MR. SNYDER:

Q. Mr. Govar, isn't it a fact that a grand jury investigation of Alvin Clay took place over a period of approximately six months?

A. Yes, sir, that is correct.

Q. And isn't it true that during the course of those six months, many, many, many witnesses appeared to testify before the grand jury?

A. That is my recollection.

Q. And by my count, that out of all of those witnesses that testified, the hundreds of questions that were asked, my count is that you asked about 13 questions. Does that sound about right?

A. That sounds about right.

Q. Did you issue any grand jury subpoenas for either witnesses or documents?

A. No, I did not.

   Q. Did you get any court orders for tax returns?

   A. No, I did not.

Govar's testimony at the April 17 hearing was not false or misleading. Govar never said that he refrained altogether from asking questions of witnesses during the grand jury proceedings at which evidence was presented regarding Clay. Although he was asked specific questions at the April 17, 2006, hearing about his actions while Clay, himself, was the witness before the grand jury, Govar was not asked about his actions in the grand jury proceedings with respect to any other witness.

  Govar's testimony that he did not present the case is supported by the grand jury transcripts. Of more than 900 questions asked of witnesses transcribed in approximately 180 pages of testimony before the grand jury in the record,[2] Govar asked less than 15 questions covering less than 4 pages of testimony. Moreover, the eight questions Govar asked of Hays at the June 1, 2004, grand jury session were preceded by Govar's statement, "[l]et me see if I understand this," confirming that Govar did ask questions for his own clarification, as Govar testified at the May 25 hearing.

  In its previous opinion, the Court stated that "Govar's participation in Clay's investigation was limited to assigning the case; assisting [Whatley] (at her request) when Clay asserted his Fifth Amendment privilege before the grand jury; and reviewing Hays's warrant affidavit for legal sufficiency, a standard procedure before searching a sensitive area like an attorney's office." That the foregoing statement was not an entirely accurate description of Govar's role in the investigation of Clay was due, not to Govar's testimony (which was consistent), but to the fact that the Court, when writing that statement, misunderstood Govar's testimony at the April 17, 2006, hearing. Govar

---

[2] The Court does not have in the record the transcript of Alvin Clay's appearance before the grand jury that is referred to in Govar's testimony at the April 17, 2006, hearing.

did not testify in April 2006 that his only participation in the grand jury proceedings regarding Clay was to assist Whatley when Clay asserted his Fifth Amendment privilege.  He did testify that, at the session during which Clay appeared as a witness, he assisted Whatley with the Fifth Amendment privilege issues, but he did not testify that he refrained altogether from asking questions when evidence regarding Clay was presented.  Although the Court's description of Govar's participation was not entirely accurate,  the Court's conclusion still stands as correct: "There is no evidence that Govar initiated the contacts with Wright, participated in the substantive development of the investigation, or participated in the ultimate decision to indict Clay."

The Court has now had two opportunities to listen to Govar testify about his role in this case and observe his demeanor.  The Court believes his testimony that he does not harbor any personal animosity against Clay.  This is not a case of vindictive prosecution.

## CONCLUSION

Clay has been afforded a vast amount of discovery, and he has found small errors here and there but no vindictive prosecution, no perjured testimony, and no intentional misconduct by the Government.  He may not be guilty of the charges – that issue will have to be decided by a jury – but nothing has been presented that would justify dismissing the charges absent a trial and acquittal.

Clay's motion for reconsideration of the Court's order of January 4, 2007, is DENIED. Document #154.

IT IS SO ORDERED this 1st day of August, 2007.

_____
J. LEON HOLMES
UNITED STATES DISTRICT JUDGE