**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**
**WESTERN DIVISION**

UNITED STATES OF AMERICA                                                    PLAINTIFF

v.                                    NO.  4:04CR00274-01 JLH

ALVIN CLAY                                                                DEFENDANT

**OPINION AND ORDER**

Alvin Clay was charged in a second superseding indictment with one count of conspiring

with Raymond Nealy and Donny McCuien to commit wire fraud in violation of 18 U.S.C. § 371 and

four counts of engaging in monetary transactions with property derived from specified unlawful

activity in violation of 18 U.S.C. § 1957 and 18 U.S.C. § 2.  A jury convicted Clay on all counts.

Clay has filed a motion for new trial or, in the alternative, for a judgment of acquittal pursuant to

Rules 33 and 29 of the Federal Rules of Criminal Procedure.  He argues that the evidence is

insufficient to support the verdict and that he did not receive effective assistance of counsel.  For the

reasons stated hereinafter, Clay's motion is denied.

**I.**

**A.**     **THE STANDARDS FOR RULING ON MOTIONS UNDER RULE 29 AND RULE 33 OF THE**
         **FEDERAL RULES OF CRIMINAL PROCEDURE**

Rule 29(a) of the Federal Rules of Criminal Procedure provides that after the government has

completed its evidence, or after all of the evidence has been received, the court on the defendant's

motion must enter a judgment of acquittal with respect to any offense for which the evidence is

insufficient to sustain a conviction.  Rule 29(c) provides that a defendant may move for a judgment

of acquittal, or renew such motion, within seven days after a guilty verdict or after the court

discharges the jury, whichever is later.  A defendant is not required to move for a judgment of

acquittal before the court submits the case to the jury as a prerequisite for making such a motion after the jury has been discharged.  In ruling on a motion for judgment of acquittal pursuant to Rule 29, the court must look at the evidence in the light most favorable to the verdict and accept as established all reasonable inferences supporting the verdict.  *United States v. Cruz*, 285 F.3d 692, 697 (8th Cir. 2002).  A verdict must be upheld if substantial evidence supports it.  *Id.*  "Substantial evidence exists if a reasonable minded jury could have found the defendant guilty beyond a reasonable doubt."  *Id.*  The standard of review is a strict one, and the court should not lightly overturn the jury's verdict.  *Id.*

Rule 33 of the Federal Rules of Criminal Procedure provides that upon the defendant's motion, the court may vacate a judgment and grant a new trial if the interest of justice so requires. The Eighth Circuit has explained:

> When a motion for new trial is made on the grounds that the verdict is contrary to the weight of the evidence, the issues are far different from those raised by a motion for judgment of acquittal.  The issue is not whether the defendant should be acquitted outright, but only whether he should have a new trial.  The district court need not view the evidence in the light most favorable to the verdict; it may weigh the evidence and in so doing evaluate for itself the credibility of the witnesses.  If the court concludes that, despite the abstract sufficiency of the evidence to sustain the verdict, the evidence preponderates sufficiently heavily against the verdict that a serious miscarriage of justice may have occurred, it may set aside the verdict, grant a new trial, and submit the issues for determination by another jury.  This authority should be exercised sparingly and with caution; nevertheless, the trial court has wide discretion in deciding whether to grant a new trial in the interest of justice.

*United States v. Lincoln*, 630 F.2d 1313, 1319 (8th Cir. 1980).  A new trial may be granted under Rule 33 "only if the evidence weighs heavily enough against a verdict that a miscarriage of justice may have occurred."  *United States v. Lanier*, 838 F.2d 281, 284-85 (8th Cir. 1988); *see also United States v. Lacey*, 219 F.3d 779, 783 (8th Cir. 2000).

**B.      THE EVIDENCE**

The second superseding indictment alleged that Clay, Nealy, and McCuien conspired to defraud and obtain money by means of false pretenses, representations, and promises from the purchasers of five homes in Little Rock and North Little Rock from August 2002 through March 2003.   During the relevant time, Clay was an attorney licensed to practice law in the State of Arkansas.   He also held a contractor's license, a real estate agent's license, and a real estate broker's license.   Nealy was a mortgage broker who shared a suite of offices with Clay and who owned and operated a company entitled Ideal Mortgage, Inc.   McCuien was a manager for Burger King and a loan originator for Nealy.   McCuien was the owner of a corporation named McCuien Property Management and Construction, Inc.

Although each transaction was slightly different, the basic structure of the scheme was the same for each of the five transactions.   An inexpensive property for sale would be located, usually by McCuien.   A purchaser would be found, again usually by McCuien, and the purchaser would be promised that the transaction would be a no-risk transaction in which, after the property was purchased, McCuien and Nealy would arrange for the property to be resold.   The purchaser also would be promised some cash from the closing.   Nealy would then obtain financing in an amount substantially greater than the asking price.   He would arrange for appraisal of the property which would value the property at or near the amount of the loan requested on behalf of the borrower.   He would prepare contracts for sale, usually using forged signatures, showing a sale price greater than the asking price, with the difference going to Clay Construction Company for rehabilitation or renovation of the property.   Nealy would submit fraudulent loan applications to lenders seeking "stated income" loans for the purchase of the property.   A stated income loan is a loan in which the

3

lender does not verify the income of the borrower. Nealy would report the borrower's income on the loan application in an inflated amount. Nealy would go with the borrower to the borrower's bank, deposit several thousand dollars into the borrower's bank account, obtain a deposit slip to be provided to the lenders, and have the borrower withdraw that money from the account and return it to him. In some instances, other information was falsified. The false information was sent to the prospective lenders by facsimile.

When the time came for closing, a Clay Construction Company invoice would be prepared showing the seller as the customer and would be faxed to the closing agent even though work to support the invoice had not been performed. In each instance, the invoice was for the amount of the difference between the amount loaned to the borrower and the amount paid to the seller plus closing costs. In each instance the closing agent issued a check to Clay Construction Company to pay the invoice from the proceeds of the loan. Because the invoice identified the seller as the customer, the payment to Clay Construction Company would be shown on the seller's side of the settlement statement. However, in each instance the seller received the agreed sales price and therefore did not question other items on the settlement statement. The lender and the borrower did not question items on the seller's side of the settlement statement because that side reflected distribution from funds due to the seller.

The first transaction involved a house at 1614 South Park Street in Little Rock. The seller was Marilyn Miller. Linda Jones was the purchaser. Miller agreed to sell the house for $32,500. Nealy obtained loans for Jones substantially in excess of $32,500. On the day of the loan closing, a Clay Construction Company invoice was sent by facsimile to the closing agent in the amount of $34,339.37 for rehabilitation work. From the loan proceeds, the closing agent issued a check payable

to Clay Construction Company in the amount of $33,939.51.  No rehabilitation work was done on the house at 1614 South Park Street.

The second transaction involved a house at 1122 West 21st Street in Little Rock.  The seller was George Hood.  Linda Jones, again, was the purchaser.  Hood agreed to sell the house for $53,000.  Nealy obtained a loan for Jones in an amount substantially greater than $53,000.  On the day of closing, a Clay Construction Company invoice for rehabilitation work was sent to the closing agent by facsimile in the amount of $31,511.50.  From the proceeds, the closing agent then issued a check payable to Clay Construction Company in the amount of $31,511.50.  No rehabilitation work was done on the house at 1122 West 21st Street.

The third transaction involved a house at 6404 Dove Lane in Little Rock.  The seller was Hulen Morton.  The purchaser was Rodney White.  Morton agreed to sell the house for $25,000. Nealy obtained a loan for White in an amount substantially greater than $25,000.  At the time of closing, a Clay Construction Company invoice in the amount of $24,286.10 was sent by facsimile to the closing agent for rehabilitation.  From the loan proceeds, the closing agent issued a check payable to Clay Construction Company in the amount of $24,286.10.  There was testimony that no rehabilitation work was done on the house at 6404 Dove Lane, but other testimony indicated that a small amount of work had been done there.

The fourth transaction involved a house at 10010 Chicot Road in Little Rock.  The seller was Imran Bohra.  The purchaser was Marcus Patillo.  Bohra agreed to sell the house for $36,000.  Nealy arranged for Patillo to receive a loan in an amount substantially greater than $36,000.  At the time of closing, a Clay Construction Company invoice in the amount of $17,522.71 for rehabilitation work was sent by facsimile to the closing agent.  From the loan proceeds, the closing agent issued

a check payable to Clay Construction Company in the amount of $17,522.71.  No rehabilitation work was done on the house at 10010 Chicot Road.

The fifth transaction involved a house at 1611 West 16th Street in North Little Rock.  The seller was Imran Bohra.  The purchaser was Robin Seals.  Bohra agreed to sell the house for $36,500.  Nealy obtained a loan for Seals in an amount substantially greater than $36,500.  At the time of closing, a Clay Construction Company invoice in the amount of $25,882.41 for rehabilitation work was sent by facsimile to the closing agent.  From the loan proceeds, the closing agent issued a check payable to Clay Construction Company in the amount of $25,882.41.  No rehabilitation work was done on the house at 1611 West 16th Street in North Little Rock.

Five checks totaling $133,142.23 were issued to Clay Construction Company for rehabilitation of the five houses in question.  Alvin Clay negotiated each of the five checks.  The evidence established that work that would justify these payments was not done.

When the first transaction closed, Clay deposited the check of $33,939.51 into the Clay Construction Company checking account and then withdrew that amount.  Clay testified that he kept $10,000, by agreement with Nealy, because he needed to buy a car.  Clay purchased three cashier's checks payable to Nealy's mother in the amounts of $9,000, $4,339.51, and $9,000.

When the second transaction closed, Clay deposited the check of $31,511.50 into the Clay Construction Company checking account.  He kept $10,000, and wrote a check to McCuien in the amount of $21,511.50, which McCuien cashed that same day at the bank where the Clay Construction Company account was held.  According to McCuien, the cash amount of $21,511.50 was then divided between him, Nealy, and Clay.  Clay denied receiving any of that cash.

When the third transaction closed, Clay deposited the check of $24,286.10 into the Clay Construction Company account, kept $3,000, and wrote a check in the amount of $21,286.10 to McCuien, which McCuien cashed that same day at the bank where the Clay Construction Company account was held. According to McCuien, the cash amount of $21,286.10 was then divided between him, Nealy, and Clay. Clay denied receiving any of that cash.

When the fourth transaction closed, Clay deposited the check of $17,522.71 into the Clay Construction Company account, kept $2,000, and wrote a check in the amount of $15,522.71 to McCuien, which McCuien cashed that same day at the bank where the Clay Construction Company account was held. According to McCuien, the cash amount of $15,522.71 was then divided between him, Nealy, and Clay. Clay denied receiving any of that cash.

When the fifth transaction closed, Clay deposited the check of $25,882.41 into the Clay Construction Company account, kept $2,582, and wrote a check to Donny McCuien in the amount of $23,300, which McCuien cashed that same day at the bank where the Clay Construction Company account was held. According to McCuien, the cash amount of $23,300 was divided between him, Nealy, and Clay. Clay denied receiving any of that cash.

From the $133,142.23 paid to Clay Construction Company in these five closings, Clay paid $22,339.51 by cashier's checks to Nealy's mother and issued checks totaling $81,620.31 to McCuien. Clay testified that those checks were written to McCuien because McCuien was supposed to be the subcontractor who performed the rehabilitation work on the properties, and it was represented to him that McCuien had completed the work. McCuien testified that it was never represented to Clay that any rehabilitation work was done. He testified that no work was ever done and no work was ever intended to be done. He testified that Clay knew that no work was ever done

and that no work was ever intended to be done.  He also testified that he had never done any construction work, had never held himself out as a contractor, and had never sold any houses.

Clay concedes that the evidence is sufficient to show that Nealy and McCuien conspired to commit wire fraud.  However, he argues that the evidence is insufficient to show that he participated in that conspiracy.  He recognizes that McCuien's testimony, if believed, would show that he was a part of the conspiracy, but he argues that McCuien is not credible.  He recognizes that the Court cannot weigh credibility of witnesses on a motion for judgment of acquittal under Rule 29, so he focuses most of his argument on the motion for new trial under Rule 33.  Clay argues:

> The Government's chief and main witness at trial was Donny McCuien.  His credibility and reliability as a witness was crucial and critical in the government's case.  His untruthfulness and lack of veracity soared during the trial of this case.  Both government and defense witnesses repeatedly bombarded his lack of truthfulness and veracity.  It cannot be gainsaid that Donny McCuien had a vested interest in the outcome of this trial and frankly it appears that he was prepared to lie to do whatever he could to protect that interest and receive favorable treatment from the government.  Although there are many instances of the successful attacks on his credibility, some just give glaring examples of what he was and is, clearly and simply a liar and a perjurer.[1]

Clay then recites numerous instances at trial at which McCuien's testimony was contradicted by other witnesses or in which McCuien was shown to be dishonest.  Clay argues that the only evidence that made him a participant in the conspiracy was the testimony of McCuien, and because McCuien was so thoroughly impeached at trial, allowing the verdict to stand would be a miscarriage of justice.

Although it is true that McCuien was the only witness who testified that Clay participated in the conspiracy, direct evidence is not required to establish that he participated in the conspiracy.

---

[1] Document #275-2 at 4-5.  The comment about McCuien's vested interest is a reference to the fact that McCuien pled guilty to one count of conspiracy to commit wire fraud pursuant to a plea agreement in which he agreed to provide truthful testimony for the government.

*United States v. Bonadonna*, 775 F.2d 949, 957 (8th Cir. 1985). A jury may infer that a person participated in a conspiracy from other facts proven in the case. *Id*. Here, a jury could reasonably infer from the evidence, apart from McCuien's testimony, that Clay participated in the conspiracy.

First, the profit from the conspiracy to commit wire fraud totaled $133,142.23, all of which was directed by the conspirators into the Clay Construction Company checking account, which Clay controlled. The fact that the conspirators directed all of the profit from the conspiracy to commit the wire fraud into a checking account controlled by Clay is evidence from which a jury could reasonably infer that Clay participated in the conspiracy. The conspiracy could not have succeeded if the profit had been directed into the account of someone who was not a participant in the conspiracy and who might have required verification that rehabilitation work had been done before distributing the proceeds. When Nealy and McCuien conspired to commit wire fraud, and as a part of their conspiracy directed on five separate occasions that the profit from the conspiracy be paid into the Clay Construction Company checking account, they must have been confident that Clay would not insist on verification that rehabilitation work had been done, and they must have been confident that Clay would not blow the whistle upon finding that no work had been done. The most logical explanation for that confidence is that Clay was a participant in the conspiracy.

A second fact or set of facts from which the jury could infer that Clay participated in the conspiracy relates to the way in which the profits from the conspiracy were distributed. Clay testified he thought that rehabilitation work had been done on each of the houses. According to his testimony, McCuien was the subcontractor who was to do the actual rehabilitation work under the auspices of Clay's contractor's license. However, the manner in which the money was divided, especially in the first two transactions, gives rise to an inference that Clay knew that no rehabilitation

work had been done.  In the first transaction, Clay kept $10,000 and bought three cashier's checks payable to Nealy's mother in the amount of $9,000, $4,339.51, and $9,000.  Clay testified that he and Nealy agreed that in that transaction he would keep $10,000 so he could buy a car.  It is highly unlikely that, if rehabilitation work had been done, the general contractor's share of the proceeds could be determined by the amount the general contractor needed to buy a car or to make some other purchase.  In a transaction in which construction work was actually performed, the profit of the general contractor could not be determined until all of the laborers and suppliers of material had been paid.  While keeping $10,000 so that he could buy a car, Clay purchased three cashier's checks totaling $22,339.51 payable to Nealy's mother.  When asked whether he owed Nealy's mother any money, Clay testified, "Oh, no, sir.  That money was to Ray Nealy for construction work."[2]  Nothing about the manner in which the funds were distributed is consistent with the manner in which funds used to pay for construction would be handled if work had actually been done.

In each of the other four instances, Clay wrote a check to McCuien, which he testified was for construction work.  However, there was no contract of any kind between Clay Construction Company and McCuien or McCuien Property Management and Construction, Inc.  Clay never asked for, and never saw, any invoices for labor and materials for any of the five houses.  He testified that he was renting his contractor's license to Nealy and McCuien, but there was no prior agreement as to how much he would be paid for any transaction.  There was neither an agreement beforehand for a flat fee for the use of Clay's contractor's license nor an agreement for him to receive a percentage of the profits after the laborers and suppliers of materials had been paid.  The jury could infer from

---

[2] Trial Transcript at 1049.

the way in which the parties handled the distribution of the proceeds from these five transactions that Clay knew that no construction work was ever done and was never intended to be done.

Clay testified that, although he did not prepare the invoices, he knew about them and was responsible for them.  He said that in every instance he looked at the HUD-1, the check, and the invoice.  He kept all three of those items for each of the transactions.  One of the invoices stated that the construction work was supervised by Alvin D. Clay.  Clay never supervised any construction work.  A jury could reasonably infer that Clay knew that the representation on the invoice that the work was supervised by him was false.

The same evidence that shows that Clay knowingly participated in the conspiracy shows that he knew that the checks he wrote to Donny McCuien were derived from wire fraud.

Clay's motion for judgment of acquittal under Rule 29 is therefore denied.  Viewing the evidence in the light most favorable to the jury verdict, and drawing all reasonable inferences in favor of the jury verdict, the evidence is sufficient to support the verdict.

Clay's motion for a new trial under Rule 33 is also denied.  Although it was shown at trial that McCuien is dishonest – indeed he admitted to pleading guilty to conspiracy to commit wire fraud – apart from McCuien's testimony, the evidence was sufficient.  It is not true that the evidence weighed against the verdict.  No miscarriage of justice occurred when the jury found Clay guilty on all five counts.  The jury could infer that Clay knowingly participated in the conspiracy from following facts that were established by the evidence apart from McCuien's testimony: (1) the conspirators directed $133,142.23 in profits from the conspiracy into a checking account controlled by Clay, from which the jury could infer the conspirators knew when they directed the proceeds of the conspiracy into that account that Clay would not require verification that work had been done

and that Clay would not blow the whistle; (2) the amounts paid to Clay from those proceeds were determined without regard to costs of labor and materials, from which the jury could infer that Clay knew that no laborers or suppliers needed to be paid because no work had been done; (3) in the first transaction the funds purportedly used to pay for the construction were paid to Nealy's mother in the form of three cashier's checks even though she was not a contractor or subcontractor; and (4) none of the indicia of a legitimate construction project – an agreement between the contractor and subcontractors, records of payments to laborers, invoices for materials, and the like – was ever requested by or provided to Clay to support the checks that he wrote from the Clay Construction Company account to distribute the profits from the conspiracy.  McCuien's testimony that Clay was a participant confirmed what the evidence otherwise showed, but the conclusion that Clay knowingly participated in the conspiracy does not depend on McCuien's credibility.

## II.

### A. THE STANDARD FOR ASSESSING A CLAIM OF INEFFECTIVE ASSISTANCE OF COUNSEL

To prevail on a claim of ineffective assistance of counsel, a defendant must show that his lawyer's performance was deficient and that the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064, 80 L. Ed. 2d 674 (1984). Proving that counsel was deficient "requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.*  "Judicial scrutiny of counsel's performance must be highly deferential."  *Id.* at 689, 104 S. Ct. at 2065.  Because of the distorting effects of hindsight and the difficulty of viewing counsel's representation of the client from the perspective available to defense counsel at the time of trial, "a

court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance . . . ." *Id.* Proving that the deficient performance prejudiced the defense requires showing that there is a reasonable probability that, but for defense counsel's mistakes, the result of the proceeding would have been different. *Id.* at 694, 104 S. Ct. at 2068. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* "When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Id.* at 695, 104 S. Ct. at 2068-69. In determining whether there is a reasonable probability that but for counsel's mistakes the result would have been different, the Court must consider the totality of the evidence before the judge or the jury. *Id.* at 695, 104 S. Ct. at 2069.

## B.   THE EVIDENCE AS TO THE CLAIM OF INEFFECTIVE ASSISTANCE OF COUNSEL

Clay was represented at trial by George E. Hairston and Ronald L. Davis, Jr. Hairston has practiced law for 34 years. He is licensed to practice in New York but has represented clients in many states and has done a fair amount of work in the state of Arkansas. He has worked for the NAACP in cases relating to criminal justice, and he has represented defendants in criminal cases. He was the lead attorney on Clay's defense team and in that capacity was the final decisionmaker for strategic decisions. Davis is a local attorney with 10 years of experience. A substantial portion of his practice involves representing criminal defendants. He has tried at least twenty-five capital murder cases, and only two of his clients in those cases have been convicted of capital murder.

In addition to Hairston and Davis, Terrence Cain assisted with writing briefs and preparing jury instructions. Davis had two associates, Darrell F. Brown, Jr., and Efrem Neely, who helped in finding and interviewing witnesses. Darrell F. Brown, Sr., originally was a part of the defense team,

but he withdrew on October 25, 2005.  While he was representing Clay, he interviewed some witnesses.  Even after he withdrew as counsel, he assisted to some extent in finding and interviewing witnesses.  Another lawyer, Teresa Bloodman, never entered an appearance but assisted in issuing and serving subpoenas.

Clay contends that defense counsel were ineffective in the following respects:

1.      Failing to interview witnesses prior to trial;

2.      Failing to call material witnesses subpoenaed to trial;

3.      Failing to request a continuance, or to ask the Court for a forthwith order to appear and show cause, when it was discovered that several critical witnesses were not present at trial;

4.      Failing to preserve all of the issues for the purpose of appeal;

5.      Failing to make an appropriate closing argument in favor of Alvin Clay;

6.      Failing to introduce evidence that would have further impeached Donny McCuien;

7.      Failing to move for judgment of acquittal on the money laundering charge (issue not preserved for appeal); and

8.      Failing to investigate.[3]

The Court held two evidentiary hearings on Clay's claim of ineffective assistance of counsel. At the first hearing, the government presented the testimony of Davis and Hairston, while Clay presented the testimony of Tiffany Pippins and Kristie Henderson.  At the second hearing, Clay presented testimony from James Swindle, Scott Winter, Lee Maris, Ronald Glenn Smith, J.B.

---

[3] This list is taken from Clay's amended brief, Document #275-2 at 11, and Clay's post-hearing brief, Document #365 at 2.

Banning, April Flowers, Wilma Ruth Kingsberry, Kenneth White, and Jason Profit.  Clay offered

a total of 60 exhibits, and the Court received 59 of them in evidence.

Several items on Clay's list of instances of alleged ineffectiveness can be grouped under the

subjects of failing to investigate and failing to call witnesses who were available to testify.

Almost a year after the indictment was returned by the grand jury, Clay's lawyers filed on

his behalf a motion asking that the indictment be dismissed on the theory of vindictive prosecution,

that evidence seized during a search of Clay's office be suppressed, and for other relief.  After the

Court denied the motion, Clay filed a motion for reconsideration.  During the adjudication of those

issues, two evidentiary hearings were held.  Clay's attorneys were provided extensive statements of

government witnesses, grand jury transcripts, FBI 302s, and FBI interview notes.  Although the

motions were denied, defense counsel obtained a vast amount of discovery.  At the hearing on the

issue of ineffective assistance of counsel, Hairston testified that he was not surprised by any evidence

offered by the government except McCuien's testimony that he had never done any construction

work and had never held himself out as a contractor.  Davis testified that, because they lost, in

hindsight they must not have done enough investigation, but, "I would not have gone in, on the front

end, thinking I was unprepared for trial."[4]

Clay has not argued or presented any evidence to show that his lawyers did not do sufficient

investigation to become aware of the evidence that the government would present at trial, nor has

he argued or presented evidence to show that they failed to prepare for cross-examination or failed

to cross-examine the government's witnesses adequately.  Obviously, Hairston and Davis were

thoroughly prepared insofar as preparation has to do with knowing what evidence the government

---

[4] Document #322 at 29.

15

would present.   Moreover, Hairston and Davis competently cross-examined the government's witnesses.

In his brief in support of his motion for new trial, Clay identifies witnesses who were available but were not called.

> For example, Delois White witnessed Donny McCuien doing construction work on one of the projects, Dove Lane; even though Donny McCuien said he had never done any construction.  Coupled with the testimony of Patricia Dean, it would have further impacted his lack of credibility and veracity.   Another witness, Freddie Lee Robinson, would have testified that Donny McCuien did construction work which would have refuted Donny McCuien's assertion that he never did construction work. Sterling Hill would have testified that Donny McCuien did work on several of the properties and that he was hired by Donny McCuien to do the same.  These witnesses would have further cemented the issue of lack of credibility, enhancing the possibility of a dismissal of the charges in the indictment.
>
> As further evidence of the ineffectiveness in representation, exhibits were provided to the defense counsel which would have established that Donny McCuien was a property owner, contrary to his previous assertions that he never owned property. Defense counsel was aware that there were other potential properties owned, by McCuien, but he failed to investigate or obtain evidence of the same.[5]

At the evidentiary hearing, Davis testified that Delois White lived near the property on Dove Lane and saw Donny McCuien doing construction work there.  Davis's associate, Efrem Neely, served her with a subpoena, but she did appear at trial.  Hairston testified that she was not an important witness in his estimation.  She "was somebody who saw somebody down the street, and time, place, all of this was kind of vague. . . .  I had no really solid information that I could judge the value of a witness."[6]

---

[5] Document #275-2 at 11-12.

[6] Document #322 at 115.

Freddie Lee Robinson was a person who purportedly had done some construction work for McCuien. He was subpoenaed to trial but did not appear. Davis testified that his associate, Efrem Neely, "found this guy [Robinson] at a local liquor store where he, apparently hung out regularly, under the tree."[7] Neely took Robinson to Hairston's hotel room, where Hairston interviewed him. Hairston testified at the post-trial hearing that he did not trust Robinson because Robinson depended on McCuien for his income. Hairston was confident that Robinson would go directly to McCuien after the conversation and tell him what had been said. Hairston did not believe that Robinson would be a good witness.[8]

Another witness, Chantel Tucker, was a bank teller who had cashed all of the checks that Clay had brought to the bank. Clay wanted to call her as a witness because she would testify that she had not seen an exchange of money between McCuien, Nealy, and Clay. Hairston testified that he was not particularly impressed with the testimony because tellers will usually give the money to the customer and then look elsewhere. He added:

> But the reason that I didn't call her was simply that I interviewed her out in the hall when she was here and she told me that voluntarily yes, she had cashed the checks, but she had spoken to her supervisor who approved the checks and told him that she was very nervous about it, and she didn't – wasn't comfortable cashing the checks. And since she brought that up, I immediately felt that this was a person that didn't really want to be there and helpful and what else was she going to say under . . . cross-examination, while, again, balancing what she had to say, which I didn't think was highly probative against what harm she could have caused, I said go home.[9]

---

[7] Document #322 at 20.

[8] Document #322 at 116.

[9] Document #322 at 117.

Sterling Hill was not called at the post-trial hearing, nor was any evidence presented as to what he would have said had he been called to testify at trial.

Except for Sterling Hill, Hairston gave a legitimate strategic reason as to why he decided not to call these witnesses or why he decided not to request a continuance and an order requiring the witnesses to appear. "'[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable.'" *Knowles v. Mirzayance*, __ U.S. __, 129 S. Ct. 1411, 1420, 173 L. Ed. 2d 251 (2009) (quoting *Strickland*, 466 U.S. at 690, 104 S. Ct. at 2066). For the witnesses who were interviewed and subpoenaed, but who either failed to appear or who appeared but were not called, Hairston made a strategic decision based on sound reasons. When questioned about his failure to ask for a continuance or a forthwith order to obtain testimony from witnesses who failed to appear, Hairston testified, "If there had been a witness of real value I felt didn't show up, then we would have done that."[10] Clay has offered no evidence to rebut Hairston's testimony.

Nearly all of the evidence presented by Clay at the two hearings on his claim of ineffective assistance of counsel is evidence that would have related to the impeachment of Donny McCuien. Tiffany Pippins testified that she dated McCuien in 2002 or 2003, that he told her that he was in the business of buying and selling properties, and that he was in the construction business. She believed that McCuien was a habitual liar and that his reputation in the community was as a habitual liar. She was not interviewed or subpoenaed for trial.

---

[10] Document #322 at 119.

Kristie Henderson testified that she bought a house from McCuien in 2006. She said that her uncle had done some construction work for McCuien. She also said that McCuien told her that he had a construction crew and a contractor's license.

James Swindle, a real estate attorney, testified that McCuien bought a home on Short Street from Norwood's Inc. He examined a document that showed that S&W Properties granted a security interest to American Alliance, which was owned by McCuien, to secure a debt that S&W Properties owed to American Alliance. Scott Winter testified that he was a partner in S&W Properties, that he had never seen the exhibit that purported to grant a security interest to American Alliance, and that S&W Properties never owed money to American Alliance.

Ronald Glenn Smith testified that he met McCuien in the spring of 2006, that McCuien had a contractor's license in the name of Complete Construction, and that he (Smith) was McCuien's lead man for construction on nine properties in 2006. McCuien was onsite for all of the projects and personally assisted in some of the construction. Each crew member worked for McCuien, and he personally paid each one. Smith was not interviewed or subpoenaed for trial.

J.B. Banning worked for Money In The Bank, a property management company that had entered into a real estate transaction with McCuien in which McCuien committed fraud.

April Flowers dated McCuien for a few months in 2003. She bought three or four houses through McCuien as rental properties. McCuien directed her to deposit his money into her bank account and obtain a deposit slip, and then withdraw the money and return it to him. The properties went into foreclosure. She believed that McCuien was dishonest. She was not interviewed or called as a defense witness.

Wilma Ruth Kingsberry testified that she was a real estate agent, originally from Miami.  In 2006 she entered into two different transactions with McCuien, one of which involved construction work that McCuien never completed.  She said that in 2006 McCuien held himself out as a contractor.  She also testified that McCuien was dishonest.

Jason Profit testified that he and his grandmother sold a home to McCuien in 2006.  Profit testified that an exhibit showing that he and his mother owed McCuien's company was false.

The exhibits that Clay offered at the post-trial hearings, like the testimony summarized above, related to real estate transactions in which McCuien had engaged, mostly in 2006 and 2007, and evidence that McCuien held himself out to be a contractor.

Assuming that Clay's defense team should have anticipated that McCuien would deny that he ever owned property and would deny that he had ever done any construction work or had held himself out to be a contractor, it does not follow that the witnesses and exhibits offered at the post-trial hearings show that Clay is entitled to relief under *Strickland v. Washington*.  Hairston and Davis obviously knew that McCuien's credibility was an important issue at trial, and they attacked McCuien's credibility throughout trial.

Robin Seals was the 28th witness to testify for the government.  On cross-examination, Davis brought out the fact that Seals's daughter was told by a police officer in Conway, Arkansas, to stay away from Donny McCuien.  The government objected, and in overruling the objection the Court stated:

> [I]nsofar as there's been an insinuation that Donny McCuien was not entirely honest, that's all the way through this trial, so I think that's harmless and I won't strike that testimony because it's been throughout this trial.  All these people who dealt with him have now testified he was dishonest with them, and he's pled guilty to

conspiracy to defraud them.  So I think the statement by the Conway police officer is harmless and I'm not going to strike it.[11]

As this exchange during the government's case-in-chief indicates, Hairston and Davis used the government's witnesses to discredit McCuien, and before the government had rested they had presented so much evidence of McCuien's dishonesty that the Court declined to strike testimony that a police officer had told Seals's daughter to stay away from Donny McCuien.  Hairston and Davis continued to attack McCuien's credibility during Clay's case-in-chief.  They called Donny McCuien's father, who contradicted McCuien's testimony that he had sold tools for his father.  His father testified, "He didn't sell no tools for me.  Donny borrowed some of my tools and never returned them."[12]  Patricia Dean was called by the defense, and she testified that she purchased properties from McCuien, one at 2600 Marshall and one on 12th Street, which contradicted McCuien's testimony that he had never owned properties.  She also testified that McCuien had performed construction work on her house.  Roma Isom was called in Clay's defense, and he testified that he had bought tools from McCuien, including a compressor, a generator, nail guns, and some other tools used in serious construction work.  Another witness, Eddie Burnett, testified that he did general handyman work for Donny McCuien.  The general handyman work was mostly yard work, but he also did painting, floor finishing, and roofing work.  He testified that he worked on three houses for McCuien, all of them vacant.  This testimony, again, contradicted McCuien's testimony that he never did any construction work.

---

[11] Trial Transcript at 761.

[12] Trial Transcript at 868.

The upshot is that Hairston and Davis thoroughly impeached McCuien at trial. They used government witnesses to demonstrate McCuien's lack of credibility, and they called witnesses in Clay's case to show that McCuien had testified falsely. Nearly all of the witnesses whom Clay now says his lawyers should have interviewed, and the exhibits that he says they should have introduced, go to the same issues. Those witnesses and exhibits would show that McCuien held himself out as a contractor, did construction work, and engaged in buying and selling properties, but such evidence was presented at trial. Thus, the evidence that Clay says that Hairston and Davis should have discovered and presented is cumulative to the evidence that was presented at trial. The Eighth Circuit has held in at least three cases that it was not ineffective assistance for counsel to fail to introduce evidence that would have been cumulative. *Winfield v. Roper*, 460 F.3d 1026, 1033 (8th Cir. 2006); *Bucklew v. Luebbers*, 436 F.3d 1010, 1019 (8th Cir. 2006); *Hall v. Luebbers*, 296 F.3d 685, 694 (8th Cir. 2002).

Clay recognizes that this evidence is cumulative. As noted above, he argued in the portion of his brief challenging the sufficiency of the evidence, "[b]oth government and defense witnesses repeatedly bombarded [McCuien's] lack of truthfulness and veracity."[13] In support of his argument in the portion of his brief challenging the sufficiency of the evidence, Clay recited much of the testimony showing that defense counsel thoroughly impeached McCuien, including evidence introduced by defense counsel showing that McCuien did construction work, held himself out as a contractor, and bought and sold real estate, all contrary to his testimony during the government's case-in-chief. Because defense counsel impeached McCuien and introduced evidence to show that

---

[13] Document #275-2 at 4.

McCuien testified falsely, the fact that further evidence could have been offered on those same points does not show that Clay is entitled to relief under *Strickland v. Washington*.

Hairston and Davis functioned as the counsel guaranteed by the Sixth Amendment. They attempted to make McCuien's credibility the dispositive issue at trial, and they used both government witnesses and defense witnesses to attack his credibility. Their performance at trial fell within the wide range of reasonable professional assistance. Clay has failed to show that there is a reasonable probability that, had the additional evidence been presented, the result of the proceeding would have been different. As noted, McCuien was thoroughly impeached, and the jury convicted Clay anyway. As the Court's analysis in the previous section of this opinion shows, ample evidence was presented to convict Clay apart from McCuien's testimony. Consequently, Clay's argument that his lawyers failed to interview witnesses, failed to call material witnesses subpoenaed to trial, failed to request a continuance or ask the Court for a show cause order when witnesses did not appear, and failed to investigate, are all overruled.

Clay also argues that defense counsel erred in failing to call an expert witness. The expert witness who could have been called was Lee Maris, an expert in mortgage lending. Maris testified at the post-trial hearing that Hairston contacted him as a possible expert regarding the mortgage industry and the meaning of "as is" loans, but Hairston never followed up, and Maris was not called as a witness. Hairston testified that early in the case he had an idea of hiring an expert to explain to the jury the role of lending companies in causing these loans to be made and to explain the nature of subprime loans. As the time for trial approached, Clay identified someone in the mortgage business as a potential expert. Hairston did not recall the name of the potential expert, but apparently the potential expert was Maris. Hairston said that the potential expert did not have a lot of

experience in testifying, which caused him some concern.   Hairston also was concerned that subprime loans had been in the news a lot, and he was concerned that calling an expert witness to talk about them might backfire.   He also thought that he could explain through the government's witnesses how the lending process worked and what was involved in the subprime loans.

At trial Hairston and Davis used the government's lending institution witnesses to explain what the jury needed to know about how the lending process worked, what the jury needed to know about subprime loans, and other such matters.   There is no evidence that an expert could have added anything of consequence to the evidence elicited on cross-examination from the government's witnesses.

Davis testified at the post-trial hearing that he and Clay were more enthusiastic about defending on the basis that these were "as is" loans than was Hairston, who did not believe that such a defense was a good strategy.   Nevertheless, Hairston and Davis cross-examined the government's witnesses from the lending institutions about the fact that these were "as is" loans, so the facts relevant to that issue were developed.   Hairston and Davis established on cross-examination that the lending institutions did not rely on the Clay Construction Company invoices in making their lending decisions but, instead based their lending decisions on the loan applications and on the appraisals.  Thus, again, the point that could have been made through an expert witness was in fact made through the government's witnesses from the lending institutions.

To the extent that Hairston made a strategic decision that this line of defense, while worth pursuing through the government's witnesses, was not as significant as Davis and Clay thought it to be, that decision is virtually unchallengeable.  *Knowles*, __ U.S. at __, 129 S. Ct. at 1420.  As the case was presented in the second superseding indictment and at trial, the ultimate victims were not

the lending institutions but the purchasers of the property.  As Hairston explained in his testimony at the post-trial hearing, "they [the government] made the decision to emphasize that the fraud was perpetrated on the so-called poor slobs who were the buyers and not the lending companies . . . ."[14] In total, the sum of $133,142.23 from the purchasers' loan proceeds was distributed at closing to Clay Construction Company even though work was not done.  While these borrowers were promised and did receive some cash as a result of the closing, the money they received came from the proceeds of loans that they were obligated to repay, and the debt that they incurred substantially exceeded the cash that they received.  That these were "as is" transactions might be relevant to the issue of whether the lenders relied on the Clay Construction Company invoices, but it was undisputed at trial that the lenders did not rely on those invoices.  The purchasers, however, unwittingly borrowed money that was paid to Clay Construction Company in return for nothing.  Therefore, the Court cannot find that Hairston's judgment on the issue of whether to present an expert witness to testify regarding "as is" loans fell outside the wide range of reasonable professional assistance.

Evidence was presented at the post-trial hearing that Clay's accountant was available to testify but was not called.  Hairston testified that he met with the accountant on the Sunday before trial.  He planned to call the accountant if the government introduced Clay's tax returns, but the Court sustained an objection to introducing the tax returns.  Hairston did not wish to call the accountant because he knew nothing of the facts and calling him might have opened the door to the introduction of Clay's tax returns.  Hairston said, "it was just a tactical matter."[15]  Again, a strategic

---

[14] Document #322 at 156.

[15] Document #322 at 114.

decision of this sort is virtually unchallengeable, and nothing has been presented to rebut Hairston's testimony that not calling the accountant was a strategic decision made for legitimate reasons.

Clay also argues that Hairston failed to make an appropriate closing argument. Hairston told the jury in closing argument that his job was trying to save Clay, and the jury's job was to help him. He rebutted the government's closing argument on the issue of whether the four persons who were purchasers were innocent victims. He reiterated Clay's testimony regarding how Clay Construction Company came to be identified as the general contractor on these properties. He explained how Clay had come to have a contractor's license in response to the government's argument that it was fraudulently obtained. He pointed out that Clay was charged with reaching an agreement with McCuien and Nealy in their conspiracy. He acknowledged that there was proof of a conspiracy but said that Clay had no part in it because he never joined it and never knew there was a conspiracy. He pointed out that the evidence presented showed that Nealy and McCuien made the false statements to the purchasers and the lenders, not Clay. He responded to the government's argument that Clay was greedy with the statement that Clay was needy, which is not a crime. He pointed out that one of the government's witnesses, Jeron Marshall, "lied to you on the stand." He explained how Clay came to be associated with Ray Nealy and why Clay trusted Nealy. He explained that Nealy's credibility flowed over to McCuien, as far as Clay was concerned, so Clay trusted McCuien based on his trust of Nealy. He spent some time going through the evidence introduced by the government (over his objection) that Clay's application for a contractor's license was fraudulent. He also spent a substantial amount of time attacking McCuien's credibility. He led into that discussion by pointing out that the prosecutor in his closing argument "didn't say very much about McCuien, did he? He didn't cite one bit of evidence from Mr. McCuien." Hairston then added:

> Think about it.  Mr. McCuien is their main guy.  He's the only one that can give you that evidence, but they never called for it.  Because they knew I was going to show you how much of a liar Mr. McCuien is.  And I guess I opened up with that.  And if you remember, I called him a liar and there was a flurry of activity and we went over there and while the white noise came on and then we proceeded.  And I'll tell you what I told the judge.  I told the judge I'm going to prove it.  I'm going to prove it to you.  Let's go ahead and look at his testimony.[16]

Hairston then proceeded in his closing argument to go through the evidence showing McCuien to be dishonest.

Hairston's closing argument fell within the wide range of reasonable professional assistance. There is no reasonable probability that a better closing argument would have changed the outcome. *Cf. Parker v. Bowersox*, 188 F.3d 923, 928 (8th Cir. 1999); *Sloan v. Delo*, 54 F.3d 1371, 1384 (8th Cir. 1995).

Clay also complains that Hairston stated in his closing argument that he needed to impeach his own client.  Clay testified on cross-examination that the Clay Construction Company invoices were legitimate, not phony, even if no work was done.  The following exchange occurred between Clay and the prosecutor:

> Q.    Out of all those businesses, Clay Construction is the only one that anything like this ever happened to, isn't it?
>
> A.    Anything like what?
>
> Q.    Well, these phoney invoices and false documents and people taking money they're not entitled to.
>
> A.    Clay Construction had nothing to do with phoney documents and people taking money or anything, had nothing to do with that.  Clay Construction had absolutely nothing to do, sir, with phoney documents.  There has been a number of witnesses up here that did not indicate that, and I am saying under

---

[16] Trial Transcript at 1181-82.

oath that Clay Construction had absolutely nothing to do with phoney, fraudulent documents.  No one has even said that.

Q.      You will admit that phoney Clay Construction invoices were sent to the title companies?

A.      Well, the invoices were not phoney, sir. . . .

Q.      I am talking about the invoices that were sent to the title companies.

A.      There was nothing phony about the invoices.  That's what the people on – the buyers and the sellers signed off on that disbursement on the settlement statement.  So there was nothing phoney about the invoices.

Q.      Well, no work was done to get the money.  The buyers didn't know –

A.      Absolutely.

* * *

Q.      You are saying that Clay Construction invoices that were sent to the title companies are totally legitimate?

A.      Absolutely.

Q.      Even if no construction work was done?

A.      Sir, if no construction work – I mean, that's not a federal –

* * *

THE WITNESS: So the invoices were totally legitimate.  What legitimized that disbursement is every buyer knew that Clay Construction was getting the amount that was on the settlement statement and there was never an invoice – there is not an invoice that doesn't reflect what the settlement statement said.  Every seller that you put in this chair knew that Clay Construction was getting a disbursement and every invoice reflects the amount that was on the settlement statement.  That's what legitimized the invoice.[17]

Hairston argued in closing as follows:

Mr. Snyder, in his remarks, I think, tried to pick away at this man's – chip away at this man's credibility.  He made quite a bit during his cross-examination, a big deal about the invoice having supervisor on it.  I think a couple of invoices had

_____

[17] Trial Transcript at 1056-58.

supervision by Alvin Clay, and that was a deception of the title company.
Ridiculous.

The title people, all they wanted was a bill.  They didn't know anything about
supervising what, you know, they didn't know anything about Alvin Clay.  Alvin
Clay is Clay Construction, you know, so he's the owner.  He should have – he could
have put owner, supervisor, whatever, it was of no moment.  He did not deceive the
title company because, in his mind, all of this was okay because he believed Nealy.
The false – the invoices were – they claim were false.  You heard Mr. Clay during his
testimony say that they were not false.  Well I kind of disagree with that.  I'm his
lawyer and I don't want to impeach my own client, but I think he was speaking of
what he believed at that time, that as far as he was concerned, that's what was going
on, that there was construction work to be done or had been done.[18]

As this argument shows, Hairston believed that Clay's testimony that the invoices were legitimate

was damaging to the defense, and the Court agrees.  Hairston made the strategic decision to try to

mitigate the damage done by Clay's testimony that the invoices were legitimate.  His decision to try

to mitigate that damage did not constitute ineffective assistance of counsel.

Clay argues that his lawyers failed to preserve all of the issues for appeal.  One of the issues

that he says they failed to preserve was a challenge to the government's use of peremptory strikes

on the ground of racial discrimination pursuant to *Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct. 1712,

90 L. Ed. 2d 69 (1986).  Although no one made a record at the trial of the racial composition of the

voir dire panel, the strikes of the parties, or the jury that was seated, the Court can take judicial notice

of those facts.  The voir dire panel consisted of thirty-four persons, three of whom appeared to be

of African-American descent.  One of those three persons was a former client of Clay's.  The

government used a peremptory strike to remove him from the jury.  A *Batson* challenge as to that

juror would not have succeeded because there was a legitimate, nondiscriminatory reason for striking

him.  Clay struck both of the other two prospective jurors who appeared to be of African-American

---

[18] Trial Transcript at 1178-79.

descent.  The government also struck one of them, but because Clay struck that person, he was in

no position to make a *Batson* challenge.  In short, there was no basis for a *Batson* challenge, and

Clay's lawyers were not ineffective for failing to make one.

Finally, Clay argues that Hairston failed to move for a judgment of acquittal on the four

money laundering counts, and he argues that this is troubling because there was no testimony that

he knew that the loan proceeds were derived from unlawful activity.  The transcript reflects that

Hairston began his argument by saying:

> At this time the defense would like to request a dismissal of the action, judgment of
> acquittal.  I believe the government has completed their case, and we would contend
> at this time that the government has failed to present sufficient evidence on this
> matter to go any further.[19]

That part of the argument is broad enough to encompass the entire indictment.  Hairston then

enumerated the elements of wire fraud, which was a predicate offense for both the conspiracy count

and the money laundering counts.  He conceded that there was evidence of a scheme to defraud by

McCuien and Nealy.  He then argued that there was no evidence that Clay knew of the fraudulent

loan applications or that he intended to engage in a scheme to defraud.  Hairston's argument thus

went to the issues of whether Clay intended to engage in fraudulent activity and whether he knew

that fraud had been committed.  If the Court had agreed with Hairston's argument, the Court would

have entered a judgment of acquittal, not only on the conspiracy charge but also on the four counts

of money laundering, because on the money laundering counts the government was required to prove

that Clay knew that the monetary transactions involved proceeds of a criminal offense.  Hairston's

argument, in effect, was that the government had failed to prove that Clay knew that the monetary

---

[19] Trial Transcript at 836.

transactions involved proceeds of a criminal offense.  Hairston's argument preserved that issue for appeal and was not ineffective.

## CONCLUSION

For the reasons stated above, Clay's motion for a new trial or for judgment of acquittal is DENIED.  Document #272.

IT IS SO ORDERED this 17th day of June, 2009.

_____
J. LEON HOLMES
UNITED STATES DISTRICT JUDGE